**In re CHATEAUGAY CORPORATION; Reomar, Inc.; The LTV Corporation, et al., Debtors.**

**UNITED STATES of America, Plaintiff–Appellee, Plaintiff–Appellant, Cross–Appellee,**

v.

**The LTV CORPORATION, Defendant–Appellee–Cross–Appellant,**

**The Committee of Equity Security Holders of the LTV Corporation, Defendant–Appellant.**

**STATE OF NEW YORK, Plaintiff–Appellant–Cross–Appellee,**

v.

**LTV STEEL COMPANY, INC., Defendant–Appellee–Cross–Appellant,**

**The Committee of Unsecured Creditors of the LTV Steel Company, Inc., Cross–Appellant.**

Nos. 1076 to 1082, Dockets 90–5024, 90–5028, 90–5030, 90–5034, 90–5038, 90–5040 and 90–5042.

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1991.

Decided Sept. 6, 1991.

---

Richard W. Mark, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., Richard M. Schwartz, James L. Garrity, Jr., Edward T. Ferguson, III, Asst. U.S. Attys., New York City; Richard B. Stewart, Asst. Atty. Gen., Vicki L. Plaut, Appellate Sec., Joel M. Gross, Environmental Enforcement Sec., U.S. Dept. of Justice, Washington, D.C.; Leonard Shen, John Wheeler, and Jon Averback, U.S. E.P.A., Washington, D.C., on the brief), for plaintiff-appellee, plaintiff-appellant-cross-appellee.

Norman Spiegel, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., Nancy Stearns, Asst. Atty. Gen., New York City, on the brief), for plaintiff-appellant-cross-appellee State of New York.

Karen E. Wagner, New York City (Lewis B. Kaden, Christine Gatto, Daniel M. Mandil, Davis Polk & Wardwell, New York City; Herbert S. Edelman, Kaye, Scholer, Fierman, Hays & Handler, New York City, on the brief), for defendants-appellees-cross-appellants.

Brian M. Cogan, New York City (Lawrence M. Handelsman, Martin S. Baker, Mark A. Speiser, Diane Dresdale, Karen S. Jore, Stroock & Stroock & Lavan, New York City, on the brief), for cross-appellant.

James E. Daniels, New York City (Edgar H. Booth, Donald L. Kuba, Mary S. Zitwer, Thomas A. Draghi, Warshaw Burstein Cohen Schlesinger & Kuh, New York City, on the brief), for defendant-appellant.

Michael H. Reed, Francis J. Lawall, James S. Lawlor, Pepper, Hamilton & Scheetz, Philadelphia, Pa., submitted a brief on behalf of amici curiae Commonwealths of Pa. and Ky. and the States of Ariz., Conn., Me., Md., Mo., N.J., N.C., R.I., S.C., and Vt.

Before NEWMAN and ALTIMARI, Circuit Judges, and CONBOY, District Judge.*

JON O. NEWMAN, Circuit Judge:

This appeal presents important issues at the intersection of bankruptcy law and environmental law. The issues arise on an appeal and a cross-appeal from the March 26, 1990, judgment of the District Court for the Southern District of New York (John E. Sprizzo, Judge) in connection with the Chapter 11 reorganization of the LTV Corporation and its related companies (collectively "LTV"). The United States, New York, and the Committee of Equity Security Holders of the LTV Corporation ("Equity Holders") appeal from the judgment to the extent that it holds that "response costs" incurred by the United States Environmental Protection Agency ("EPA") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (1988), are pre-petition "claims," dischargeable in bankruptcy, regardless of when such costs are incurred, as long as they concern a release or threatened release of hazardous substances that occurred before the debtor filed its Chapter 11 petition. *In re Chateaugay Corp.,* 112 B.R. 513 (S.D.N.Y.1990). LTV Corporation, LTV Steel Company, Inc., and the Committee of Unsecured Creditors of LTV Steel Company, Inc. ("Unsecured Creditors") cross-appeal from the judgment to the extent that it holds that the debtor's obligation to oper-

ate and maintain facilities it owns or operates as required by environmental laws, regardless of when the offending condition arose, is not dischargeable and that CERCLA response costs incurred during the bankruptcy at sites owned or operated by the debtor constitute expenses of administration entitled to priority. *Id.* We affirm.

## Background

LTV is a diversified steel, aerospace, and energy corporation with operations in several states. LTV filed a bankruptcy petition under Chapter 11 on July 16, 1986. The debtor's schedule of liabilities included 24 pages of claims, labeled "contingent," that were held by EPA and the environmental enforcement officers of all fifty states and the District of Columbia. The schedule provided no details concerning these claims. EPA filed a proof of claim for approximately $32 million, representing response costs incurred pre-petition at 14 sites where LTV had been identified as a "potentially responsible party" ("PRP") under CERCLA. *See* 42 U.S.C. § 9607(a) (1988). EPA alleges that only one of these sites has reached the point where no further response costs are anticipated, and that the 14 sites are not necessarily all of the sites for which LTV might ultimately be determined to be a PRP. Thus, the $32 million in incurred response costs might be only a small fraction of the total CERCLA liability that EPA will ultimately assert against LTV.

Appreciating the distinction between the listed contingent claims and the claim for incurred response costs requires some understanding of the framework for recovery of CERCLA response costs. Section 104 of CERCLA authorizes EPA to take "any ... response measure consistent with the national contingency plan which [EPA] deems necessary to protect the public health or welfare or the environment" whenever "any hazardous substance is released or there is a substantial threat of such a release into the environment...."

* The Honorable Kenneth Conboy of the District Court for the Southern District of New York, sitting by designation.

*Id.* § 9604(a). Upon identification of a release or threatened release, EPA makes an investigation to determine if the environmental risk is of sufficient severity to warrant inclusion of the site on the National Priorities List. Thereafter, EPA selects an appropriate remedy and can either order the potentially responsible party to take the remedial action under section 106(a), *id.* § 9606(a), or take the remedial action itself, using so-called Superfund money, and seek reimbursement for such response costs under section 107(a), *id.* § 9607(a), after the costs have been incurred.

With respect to the listed contingent claims, *i.e.,* those for which response costs had not been incurred pre-petition, LTV informed the Government that it expected confirmation of a reorganization plan to discharge all obligations of LTV concerning environmental liabilities that are traceable to pre-petition conduct of LTV, including obligations for response costs that are incurred post-confirmation. In disagreement with that position, the Government brought an adversary proceeding for a declaratory judgment that response costs incurred post-confirmation are not dischargeable because they do not arise from pre-petition claims. In the Government's view, it does not have a "claim" within the meaning of the Bankruptcy Code, 11 U.S.C. § 101(4) (1988), for reimbursement of CERCLA response costs until those costs have been incurred.

On the primary issue between the parties, the District Court ruled substantially in favor of LTV. Judge Sprizzo did not go quite so far as to consider response cost claims to be dischargeable whenever based on LTV's pre-petition conduct, a position that would have included LTV's pre-petition conduct of placing hazardous substances in sealed containers, followed by release of the substances into the environment years after confirmation. However, he agreed with LTV to the extent of ruling that an obligation to reimburse EPA for response costs is a dischargeable claim whenever based upon a pre-petition release or threatened release of hazardous substances. This ruling covers releases that have occurred pre-petition, even though they have not then been discovered by EPA (or anyone else).

The Court then considered which environmental claims based on injunctions were dischargeable. Applying that portion of the Code definition of "claim" that includes a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment," *id.* § 101(4), Judge Sprizzo stated that claims for injunctive relief based on a pre-petition release or threatened release would be dischargeable if the injunctive relief was an option EPA was electing to use in lieu of incurring response costs itself and thereafter seeking reimbursement; on the other hand, he continued, "where there is no right to such payment for cleanup or other remedial costs, claims for injunctive relief do not fall within the Bankruptcy [Code] and are not dischargeable." 112 B.R. at 523.

This deceptively simple statement perhaps obscures difficult questions of application because it is not clear which forms of injunctive relief Judge Sprizzo regards as being an option to EPA's right of response cost reimbursement and which entail "no right to such payment." As an example of the latter category, the District Judge cited section 106 of CERCLA, yet this is the provision the Government views as its alternative remedy to incurring and seeking reimbursement for response costs under section 107. Brief for United States at 13. In any event, it is clear that Judge Sprizzo intended to render nondischargeable some forms of injunctive relief that go far beyond merely ordering LTV to stop a release or threatened release of hazardous substances. He expressly rejected LTV's contention that an injunctive provision should be dischargeable "merely because the debtor would be required to expend money in order to comply with the injunction," 112 B.R. at 523, and observed, "To accept that argument would render dischargeable any claims for injunctive relief other than those merely seeking the cessation of some unlawful activity." *Id.* (footnote omitted). Plainly, the District Court has ruled not dischargeable some injunctive provisions requiring cleanup activity, but it

is not entirely clear how the Court proposes to identify those that are dischargeable because they are an option to recovery of response costs. Moreover, we learn nothing about the scope of the judgment on this aspect of the case from its terms because it omits all precision as to what rights are being declared, reciting only that both the plaintiffs' and the defendants' motions for summary judgment "are granted in part and denied in part."

It may be that the Court sought to distinguish somewhat mechanically between those injunctive provisions that contain within their terms an option for payment and those that do not. The Court initially recognized that "an optional *right* to payment," such as EPA has under section 107, "is nonetheless a right to payment and the fact that EPA may not choose to exercise that option in no way negates the existence of that right. It follows that absent any congressional intent to preclude the dischargeability of such claims, these claims for injunctive relief fall within the broad language of Section 101(4)." 112 B.R. at 522 (emphasis in original). That observation would seem to render dischargeable all injunctive provisions for cleanup activity since EPA always has the option to incur response costs and seek reimbursement. Yet the Court immediately thereafter ruled nondischargeable claims for injunctive relief "where there is no right to such payment for cleanup or other remedial costs," citing, among other provisions, section 106 of CERCLA. *Id.* at 523.

The parties appear to take differing views of the extent to which the judgment rules injunctive relief to be dischargeable. The Government views the judgment as holding "post-confirmation environmental obligations ... not dischargeable." Brief for United States at 23 n. *. Elaborating somewhat, the Government says that the District Court "properly recognized that injunctive relief requires the debtor to spend its own money to ensure that *its continuing operations* comply with law." *Id.* (emphasis added). Though that statement leaves it unclear whether the Government thinks that what survives confirmation are injunctive provisions concerning only post-confirmation pollution or all injunctive provisions requiring cleanup of pre-petition pollution, subsequent papers make clear that the Government understands the District Court to have left unaffected by discharge all injunctions ordering the estate "to clean up its property." Reply Brief for United States at 13.

The cross-appellants understand the District Court to have ruled nondischargeable injunctive provisions requiring cleanup of pre-petition actual or threatened discharges, but they too do not distinguish between provisions that are an option to recovery of response costs and those that are not. In their view, all injunctive provisions should be dischargeable if they seek to remedy pre-petition discharges (because the option of seeking reimbursement for response costs is always available), and nondischargeable provisions are only those that require the debtor to cease conduct resulting in discharges. At least that appears to be the position of LTV. *See* Brief for LTV at 24–25. The Unsecured Creditors appear to go further, contending "that any injunctive relief which requires the expenditure of money creates a right to payment which gives rise to a dischargeable claim." *See* Brief for Unsecured Creditors at 8.

Finally, the District Court granted EPA's request for a declaratory judgment that cleanup costs assessed post-petition with respect to sites currently owned by LTV, where there has been a pre-petition release or threatened release, are entitled to an administrative priority, 11 U.S.C. § 503(b)(1)(A) (1988).

EPA, New York, and the Equity Holders appeal the ruling that pre-petition releases and threatened releases are dischargeable claims. LTV and the Unsecured Creditors cross-appeal to challenge the rulings concerning the non-dischargeability of injunctive remedies and the entitlement of cleanup costs on LTV-owned properties to an administrative priority.

### Discussion

Before considering the separate issues, it will be useful to discuss the parties' dis-

agreement as to the overall approach that should guide our resolution of the case. All the parties, to varying degrees, point to a conflict between the Bankruptcy Code and CERCLA and urge that one statute or the other be accorded primacy, depending on which statute supports the position they assert in this litigation.

We agree that the Bankruptcy Code and CERCLA point toward competing objectives. The Code aims to provide reorganized debtors with a fresh start, an objective made more feasible by maximizing the scope of a discharge. CERCLA aims to clean up environmental damage, an objective that the enforcement agencies in this litigation contend will be better served if their entitlement to be reimbursed for CERCLA response costs based on pre-petition pollution is not considered to be a "claim" and instead may be asserted at full value against the reorganized corporation. Preliminarily, we note that the conflict in objectives might not be quite as stark as the parties contend. Cleaning up the environment will not necessarily be aided by agreeing with the agencies that they do not yet have "claims." A determination that the CERCLA response costs ultimately to be incurred are not now claims might impair the prospects of achieving a viable reorganization, with the result that the debtor, instead of reorganizing, liquidates under Chapter 7 or dissolves under state law, and the assets of the corporation are either unavailable for environmental cleanup costs because such costs are not yet "claims" entitled to pro rata payment, or available only to the limited extent that such costs are considered unaccrued claims for which reserves must be established under state law. *See* Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 51 (1986).

But to whatever extent the Code and CERCLA point in different directions, we do not face in this context a conflict between two statutes, each designed to focus on a discrete problem, which happen to conflict in their application to a specific set of facts. *Cf. SCM Corp. v. Xerox Corp.*, 463 F.Supp. 983 (D.Conn.1978) (discussing need to harmonize antitrust and patent laws), *aff'd*, 645 F.2d 1195 (2d Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982). Here, we encounter a bankruptcy statute that is intended to override many provisions of law that would apply in the absence of bankruptcy—especially laws otherwise providing creditors suing promptly with full payment of their claims. Of course, the comprehensive nature of the bankruptcy statute does not relieve us of the obligation to construe its terms, nor may we resolve all issues of statutory construction in favor of the "fresh start" objective, regardless of the terms Congress has chosen to express its will. Our point is the more limited one that in construing the Code, we need not be swayed by the arguments advanced by EPA that a narrow reading of the Code will better serve the environmental interests Congress wished to promote in enacting CERCLA. If the Code, fairly construed, creates limits on the extent of environmental cleanup efforts, the remedy is for Congress to make exceptions to the Code to achieve other objectives that Congress chooses to reach, rather than for courts to restrict the meaning of across-the-board legislation like a bankruptcy law in order to promote objectives evident in more focused statutes.

With these considerations in mind, we turn to the specific issues.

1. *Unincurred CERCLA response costs for pre-petition releases as "claims."* Section 101(4) of the Bankruptcy Code defines a "claim" as a

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(4) (1988). Congress unquestionably expected this definition to have wide scope. "By this broadest possible definition ... the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong., 2d Sess. 309 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6266. *See also Johnson v. Home State Bank,* — U.S. ——, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991); *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). That language surely points us in a direction, but provides little indication of how far we should travel.

As a matter of bankruptcy theory, it has been persuasively argued that a "claim" should be deemed to exist whenever, in the absence of bankruptcy, a particular claimant has the right to reach the debtor's assets. *See* Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 34–35 (1986); *see also Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 170, 67 S.Ct. 237, 243, 91 L.Ed. 162 (1946) (Frankfurter, J., concurring) (non-bankruptcy law determines existence of a claim). That approach, Professor Jackson argues, maximizes bankruptcy law as a collective debt-collection device, thereby achieving its primary objective. But we are obliged to apply the bankruptcy law that Congress has enacted, not to reformulate it as theorists would prefer to see it. Thus, for example, we have declined to consider as a "claim" a civil service retirement agency's right to recoup an employee's loan from future retirement benefits because the agency has no right to reimbursement; it can never do more than offset the loan against future benefits. *See In re Villarie,* 648 F.2d 810, 812 (2d Cir. 1981). The putative claimant in *Villarie* did not hold an unmatured claim on which it could one day sue; under the governing non-bankruptcy law that defined its rights, it could never sue. It thus had no "right to payment" within the meaning of the Code's definition of "claim." Though *Villarie* does not comport with Professor Jackson's

theoretical model, *see* Jackson, *supra,* at 35 n. 23, it endeavors to faithfully apply the Bankruptcy Code as written.

Defining claims to include any ultimate right to payment arising from pre-petition conduct by the debtor comports with the theoretical model of assuring that all assets of the debtor are available to those seeking recovery for pre-petition conduct. But such an interpretation of "claim" yields questionable results. Consider, for example, a company that builds bridges around the world. It can estimate that of 10,000 bridges it builds, one will fail, causing 10 deaths. Having built 10,000 bridges, it becomes insolvent and files a petition in bankruptcy. Is there a "claim" on behalf of the 10 people who will be killed when they drive across the one bridge that will fail someday in the future? If the only test is whether the ultimate right to payment will arise out of the debtor's pre-petition conduct, the future victims have a "claim." Yet it must be obvious that enormous practical and perhaps constitutional problems would arise from recognition of such a claim. The potential victims are not only unidentified, but there is no way to identify them. Sheer fortuity will determine who will be on that one bridge when it crashes. What notice is to be given to these potential "claimants"? Or would it suffice to designate a representative for future victims and authorize the representative to negotiate terms of a binding reorganization plan?

To expect "claims" to be filed by those who have not yet had any contact whatever with the tort-feasor has been characterized as "'absurd.'" *See Schweitzer v. Consolidated Rail Corp. (Conrail) (In re Central R. Co. of New Jersey),* 758 F.2d 936, 943 (3d Cir.) (quoting *Gladding Corp. v. Forrer (In re Gladding Corp.),* 20 B.R. 566, 568 (Bankr.D.Mass.1982)), *cert. denied,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *see also Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.),* 730 F.2d 367, 375 & n. 6 (5th Cir.1984) (victims of post-bankruptcy accident resulting from pre-bankruptcy faulty design had no "claims" under former Bankruptcy Act,

and court need not consider whether "claims" would exist under Bankruptcy Code).

Even where a tort victim has had some pre-petition contact with the tort-feasor, such as purchasing a product or working in proximity to hazardous materials, some courts have declined to recognize a "claim" in advance of some manifestation of injury. *See Schweitzer*, 758 F.2d at 944; *In re Forty–Eight Insulations, Inc.*, 58 B.R. 476, 477 (Bankr.N.D.Ill.1986); *In re Amatex Corp.*, 30 B.R. 309 (Bankr.E.D.Pa.), *aff'd*, 37 B.R. 613 (E.D.Pa.1983), *rev'd on other grounds*, 755 F.2d 1034 (3d Cir.1985) (future claimants entitled to representation, whether or not holding "claims"); *In re UNR Industries, Inc.*, 29 B.R. 741, 744–46 (N.D.Ill.1983), *appeal dismissed*, 725 F.2d 1111 (7th Cir.1984); *In re Gladding*, 20 B.R. 566, 567–68 (Bankr.D.Mass.1982). Yet other courts, construing the broad definition of "claim" under the Bankruptcy Code, have ruled that those exposed to a hazardous product like asbestos do have claims, despite the absence of manifest injury. *See In re Johns–Manville Corp.*, 57 B.R. 680, 686–88 (Bankr.S.D.N.Y.1986)[1]; *cf. Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 203 (4th Cir.) (user of Dalkon shield had claim subject to automatic stay, but not necessarily dischargeable claim, though injury not apparent from use of shield), *cert. dismissed*, 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988); *see also In re Edge*, 60 B.R. 690 (Bankr.M.D.Tenn. 1986) (claim for negligent dental service, though negligence discovered post-petition). In *In re UNR Industries, Inc.*, the Seventh Circuit, in dismissing the appeal, expressly noted the "difficult and far-reaching questions" concerning whether future asbestos victims have pre-petition claims. 725 F.2d at 1120.

Accepting as claimants those future tort victims whose injuries are caused by pre-petition conduct but do not become manifest until after confirmation, arguably puts considerable strain not only on the Code's definition of "claim," but also on the definition of "creditor"—an "entity that has a claim against the debtor that *arose* at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(9)(A) (1988) (emphasis added). It has been suggested that the "arose" limitation is an inartfully drafted provision not intended to exclude tort victims injured by pre-petition conduct, but designed instead to make sure that those supplying goods and services to the debtor during reorganization do not fall within the category of claimants who have their claims reduced pro rata. *See* Mark Roe, *Bankruptcy and Mass Tort*, 84 Colum.L.Rev. 846, 895–96 (1984). Indeed, reading the "creditor" definition too narrowly risks undue limitation of the deliberately broad definition of "claim," especially the express inclusion of unmatured and contingent claims.

We need not decide how the definition of "claim" applies to tort victims injured by pre-petition conduct, especially as applied to the difficult case of pre-petition conduct that has not yet resulted in detectable injury, much less the extreme case of pre-petition conduct that has not yet resulted in any tortious consequence to a victim. We deal here with the far more manageable problem of sums ultimately to be owed to EPA at such time as it incurs CERCLA response costs. When such costs are incurred, EPA will unquestionably have what can fairly be called a "right to payment." That right is currently unmatured and will not mature until the response costs are incurred. In the context of contract claims, the Code's inclusion of "unmatured" and "contingent" claims is usually said to refer to obligations that will become due upon the happening of a future event that was "within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd mem.*, 646 F.2d 193 (5th Cir.1981).

---

**1.** In affirming the confirmation of the reorganization plan and its provision for future claimants, we did not adjudicate whether the future claimants had "claims" since the litigant challenging confirmation lacked standing to raise that issue. *See Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 843 F.2d 636, 641–45 (2d Cir.1988).

The concepts of "maturity" and "contingency" are not readily transferable from the context of contracts to that of tort and statutory claims.

■ Yet the evident intent of Congress to apply broadly the definition of "claim" counsels against the narrow reading urged by EPA, especially in the context of obligations arising out of public regulation. Though there does not yet exist between EPA and LTV the degree of relationship between claimant and debtor typical of an existing though unmatured contract claim, the relationship is far closer than that existing between future tort claimants totally unaware of injury and a tort-feasor. EPA is acutely aware of LTV and vice versa. The relationship between environmental regulating agencies and those subject to regulation provides sufficient "contemplation" of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of "claims." True, EPA does not yet know the full extent of the hazardous waste removal costs that it may one day incur and seek to impose upon LTV, and it does not yet even know the location of all the sites at which such wastes may yet be found. But the location of these sites, the determination of their coverage by CERCLA, and the incurring of response costs by EPA are all steps that may fairly be viewed, in the regulatory context, as rendering EPA's claim "contingent," rather than as placing it outside the Code's definition of "claim."

Judge Sprizzo recognized that "before a contingent claim can be discharged, it must result from pre-petition conduct fairly giving rise to that contingent claim." 112 B.R. at 521. Though relying on pre-petition conduct, the District Court did not go so far as to include CERCLA response costs attributable to any action of the debtor that occurred pre-petition, such as the construction of a storage facility. Instead, the Court carefully limited its ruling to pre-petition releases or threatened releases of hazardous substances.

We think the District Court properly applied the Bankruptcy Code's definition of "claim." Though one bankruptcy court has reached a contrary conclusion, In re Jensen, 114 B.R. 700 (Bankr.E.D.Cal.1990), we note that this decision has recently been reversed on appeal, the bankruptcy appellate panel explicitly agreeing with Judge Sprizzo's decision in the pending case. In re Jensen, 127 B.R. 27, 33 (9th Cir.BAP 1991).[2]

Moreover, we are not unmindful of the observations of Justice O'Connor concerning the disadvantage to environmental claimants if "claim" is interpreted to exclude items like unincurred CERCLA response costs. See Ohio v. Kovacs, 469 U.S. 274, 285–86, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985) (O'Connor, J., concurring). Accepting EPA's argument in this Chapter 11 reorganization case would leave EPA without any possibility of even partial recovery against a dissolving corporation in a Chapter 7 liquidation case. Indeed, while EPA obviously prefers in this case to keep its CERCLA claim outside of bankruptcy so that it may present it, without reduction, against the reorganized company that it anticipates will emerge from bankruptcy, one may well speculate whether, if unincurred CERCLA response costs are not claims, some corporations facing substantial environmental claims will be able to reorganize at all.

We see no merit in EPA's contention that holding unincurred CERCLA response costs to be "claims" so long as a release or threatened release of hazardous wastes has occurred pre-petition is precluded by

**2.** We also note the arguably contrary ruling of the District Court in *United States v. Union Scrap Iron & Metal,* 123 B.R. 831 (D.Minn.1990). The Court ruled that a CERCLA claim, pursued by the Government after a debtor had emerged from a Chapter 11 reorganization, was not a "claim" that had been discharged, despite the fact that the release of hazardous substances had occurred pre-petition. The Court distinguished Judge Sprizzo's decision in the pending case on the ground that in the LTV reorganization proceeding the government agencies had an opportunity to file their environmental claims before confirmation, *id.* at 836, whereas in *Union Scrap,* the dispute arose years after confirmation, rather than in a declaratory judgment action filed during the pendency of the Chapter 11 proceeding.

CERCLA itself. Specifically, EPA points to the 1986 amendment to section 113 of CERCLA, prohibiting pre-enforcement judicial review. Pub.L. No. 99–499, § 113(c)(2), 100 Stat. 1613, 1649 (1986) (codified at 42 U.S.C. § 9613(h) (1988)); *see In re Combustion Equipment Associates, Inc.*, 838 F.2d 35, 37 (2d Cir.1988). In considering this contention, we note preliminarily that EPA is not asserting that the issue of whether it has dischargeable "claims" for the unincurred response costs is not ripe for adjudication in an action for a declaratory judgment. EPA took that position in *In re Combustion Equipment Associates, Inc.*, *supra*, in which the debtor, after emerging from reorganization, sought a declaratory judgment that unincurred response costs based on pre-petition releases were claims that had been discharged. We considered that dispute unripe, leaving open the issue of whether a declaratory judgment would be appropriate *during* a reorganization proceeding, at a time when the bankruptcy court has the power to estimate contingent claims. *Id.*, 838 F.2d at 40. EPA, having brought this declaratory judgment action, is not disputing that the suit is ripe; it is contending that the ban on pre-enforcement judicial review requires that it receive a declaratory judgment upholding its contention that unincurred response costs are not dischargeable "claims." We disagree.

The assumption that appears to underlie EPA's concern that the bankruptcy proceeding amounts to pre-enforcement judicial review of CERCLA claims is that extensive factual inquiry will have to be undertaken. EPA contends that it "would be forced to litigate in the bankruptcy proceedings to liquidate and fix any claims it might conceivably have against [LTV] for post-confirmation response costs" at numerous sites. Brief for United States at 42. This is not necessarily so. Contingent claims may be estimated if their liquidation "would unduly delay the administration of the case." 11 U.S.C. § 502(c) (1988). Though EPA fears that even an estimation process would "embroil the parties and the bankruptcy court in disputes over the wisdom and scope of possible remedies," Brief for United States at 42, nothing prevents the speedy and rough estimation of CERCLA claims for purposes of determining EPA's voice in the Chapter 11 proceedings, with ultimate liquidation of the claims to await the outcome of normal CERCLA enforcement proceedings in which EPA will be entitled to collect its allowable share (full or pro rata, depending on the reorganization plan) of incurred response costs. *See Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 137 (3d Cir.1982); *In re Radio–Keith–Orpheum Corp.*, 106 F.2d 22 (2d Cir.1939), *cert. denied*, 308 U.S. 622, 60 S.Ct. 377, 380, 84 L.Ed. 519, 520 (1940).

We agree with Judge Sprizzo that CERCLA's prohibition of pre-enforcement review is simply inapplicable. The Court is not being called upon to "review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title." 42 U.S.C. § 9613(h) (1988). We therefore need not decide whether CERCLA's ban on pre-enforcement review, if applicable, would constitute an implied repeal of the authority otherwise conferred on federal courts by the Bankruptcy Code.

2. *Injunctive remedies as "claims."* As we have noted, the Code's definition of "claim" includes a

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(4)(B) (1988). *See Roxse Homes, Inc. v. Roxse Homes Limited Partnership*, 83 B.R. 185, 188 (D.Mass.), *aff'd mem.*, 860 F.2d 1072 (1st Cir.1988). As with the portion of the "claim" definition concerning monetary obligations, thoughtful commentators have urged an interpretation of the "equitable remedy" language to carry out what they understand to be the appropriate objectives of bankruptcy law. *See* Douglas G. Baird & Thomas H. Jackson, Kovacs *and Toxic Wastes in Bankruptcy*, 36 Stan.L.Rev. 1199, 1204 (1984) (hereinafter "Baird") We reckon

with their argument not only because of its force but also because its consideration illuminates and helps resolve the difficulty we have encountered in understanding the scope of the District Court's ruling.

Professors Baird and Jackson advance the thesis that injunctions imposing an equitable obligation should be dischargeable claims whenever a non-bankrupt corporation could have effectively escaped from the burden of the obligation through dissolution under state law. In making the argument, they purport to divide the universe of environmental injunctions into (a) those that impose obligations "that arise because of the debtor's continued existence and that would disappear if the debtor were to cease operations" and (b) those that impose obligations "that result from activities engaged in before the filing of the petition and whose consequences *continue* to exist even if the debtor goes out of business." Baird, *supra,* at 1204 (emphasis in original). In their view, obligations in the first category are not dischargeable claims; those in the second category are. Their point is that this classification achieves the desirable result of mirroring non-bankruptcy consequences under prevailing substantive law (whether state or federal). If a corporation dissolves in the absence of bankruptcy, its obligations in the first category cease to have meaning; therefore, obligations of this sort should not be affected by bankruptcy and are properly considered non-dischargeable. On the other hand, obligations in the second category would be claims upon a debtor in dissolution; therefore, the governmental enforcers of the obligation should share in the assets of the corporation and this result is achieved if the obligations are recognized as claims.

An initial difficulty with the argument, before we even consider whether it squares with the Bankruptcy Code as written, is that the two categories are not as mutually exclusive as the argument suggests. For Baird and Jackson, the distinction is simply between an injunction "to cease polluting" (non-dischargeable) and an injunction "to clean up toxic wastes that already have been deposited" (dischargeable). For some

injunctions, the distinction is clear. An order to stop burning high-sulphur fuel is clearly in the first category, and an order to remove containers of radioactive waste, feared to become insecure in the future, is clearly in the second category. But what of an order, typical of CERCLA orders, to clean up a toxic waste site from which hazardous substances are leaching into nearby water supplies? *See, e.g., New York v. Shore Realty Corp.,* 759 F.2d 1032 (2d Cir.1985). To some extent the order requires the defendant to "stop polluting," *i.e.,* to stop the run-off of hazardous substances from its property, and to some extent the order requires the defendant to "clean up toxic wastes that have already been deposited," *i.e.,* to pay for the removal of the hazardous substances.

We will return to the classification problem shortly, but for now, assuming that some orders can be divided as suggested, we consider whether the Bankruptcy Code makes the distinction that has been urged. Manifestly, the Code does not say expressly that dischargeable orders are those that impose mandatory obligations to remedy past misconduct and that non-dischargeable orders are those that impose prohibitions against future misconduct. Instead, the Code defines "claim" to include "an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(4)(B) (1988). That wording, Baird and Jackson argue, is merely an "inartful[ ]" way of capturing the distinction they endorse. Baird, *supra,* at 1204.

We think we must endeavor to apply the "claim" definition as written, mindful of the purposes of bankruptcy law but without the prerogative of rewriting it to maximize bankruptcy objectives that Congress might not have fully achieved. Thus, we must determine whether the injunctions, alleged to give rise to dischargeable "claims," impose a remedy for a performance breach that gives rise to a right of payment. A clear example of such an order may help to focus our inquiry. A seller of a unique property has an enforceable duty to convey the property to a buyer.

For breach of that duty, a court may order the remedy of specific performance. In some states, however, the specific performance obligation may be satisfied by an alternative right to payment, in which event the specific performance creditor has a "claim" in bankruptcy. *See* 2 *Collier on Bankruptcy* ¶ 101.05, at 101–31 (15th ed. 1991). This was the example used in Congress in explaining the reach of section 101(4)(B). *See* 124 Cong.Rec. 32393 (1978) (remarks of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Admin.News 6436, 6437; *see also id.* at 33992 (remarks of Sen. DeConcini), *reprinted in* 1978 U.S.Code Cong. & Admin.News 6505, 6506.

While this example illustrates the type of injunction that gives rise to a dischargeable claim, its simplicity contrasts with the more typical injunctions encountered in environmental cases, and therein lies our problem. These injunctions, as we have noted, frequently combine an obligation as to which the enforcing agency has an alternative right to payment with an obligation as to which no such alternative exists. An injunction that does no more than impose an obligation entirely as an alternative to a payment right is dischargeable. Thus, if EPA directs LTV to remove some wastes that are not currently causing pollution, and if EPA could have itself incurred the costs of removing such wastes and then sued LTV to recover the response costs, such an order is a "claim" under the Code. On the other hand, if the order, no matter how phrased, requires LTV to take any action that ends or ameliorates current pollution, such an order is not a "claim."

We think that is precisely the distinction the District Court was endeavoring to achieve when it ruled that injunctions sought as an option to EPA's (or a state's) right to incur and sue for response costs are within section 101(4), but that "where there is no right to such payment for cleanup or other remedial costs, claims for injunctive relief" are not dischargeable. 112 B.R. at 523. In any event, it is the distinction we believe is made by the "claim" definition of the Code. EPA is entitled to seek payment if it elects to incur cleanup

costs itself, but it has no authority to accept a payment from a responsible party as an alternative to continued pollution. Thus, a cleanup order that accomplishes the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim. It is true that, if in lieu of such an order, EPA had undertaken the removal itself and sued for the response costs, its action would have both removed the accumulated waste and prevented continued pollution. But it is only the first attribute of the order that can be said to remedy a breach that gives rise to a right to payment. Since there is no option to accept payment in lieu of continued pollution, any order that to any extent ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a "claim." But an order to clean up a site, to the extent that it imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, is a "claim" if the creditor obtaining the order had the option, which CERCLA confers, to do the cleanup work itself and sue for response costs, thereby converting the injunction into a monetary obligation. We recognize that most environmental injunctions will fall on the non-"claim" side of the line. On this understanding, we affirm the District Court's ruling concerning injunctions.

In reaching this conclusion, we have reckoned with the Supreme Court's decision in *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), and agree with Judge Sprizzo that it does not preclude the ruling he has made. *Kovacs* involves an individual debtor rather than a corporate debtor and a Chapter 7 liquidation rather than a Chapter 11 reorganization, but neither distinction appears to affect the Court's determination that the cleanup order obtained by Ohio was a dischargeable claim. What seems to have been decisive was the fact that Ohio obtained the appointment of a receiver, precluded Kovacs from taking any steps to comply with the injunction, and was seeking from Kovacs only the payment of mon-

ey. The Court expressly noted that it was not deciding "what the legal consequences would have been had Kovacs taken bankruptcy before a receiver had been appointed and a trustee had been designated with the usual duties of a bankruptcy trustee." *Id.* at 284, 105 S.Ct. at 710 (footnote omitted). The Court also emphasized that it was "not question[ing] that anyone in possession of the site ... must comply with the environmental laws of the State of Ohio." *Id.* at 285, 105 S.Ct. at 711.

To some extent *Kovacs* involves the same dilemma we face in determining what aspects of an environmental injunction give rise to a right of payment. The order in *Kovacs* enjoined the defendants "from causing further pollution of the air or public waters" and "required the defendants to remove specified wastes from the property." *Id.* at 276, 105 S.Ct. at 706. Like most environmental decrees, it thus contained "a negative order to cease polluting" and "an affirmative order to clean up the site." *Id.* at 279, 105 S.Ct. at 708. However, the Court was spared the need to determine precisely which obligations of the order, as entered, could be said to constitute a "claim" because, by virtue of Ohio's actions, "the cleanup order had been converted into an obligation to pay money." *Id.* at 283, 105 S.Ct. at 710. To the extent that CERCLA affords EPA and others a right to payment in lieu of an order directed solely at cleanup, *Kovacs* indicates that such an order is a "claim." And to the extent that an order is obtained under CERCLA or any other environmental statute that seeks to end or ameliorate pollution, we are satisfied that nothing in *Kovacs* permits a discharge of such obligation. As the Court concluded, a person or firm in possession of a site "may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions." *Id.* at 285, 105 S.Ct. at 711.

We recognize that in the context of environmental remedies the line between "claim" injunctions and non-"claim" injunctions could arguably be drawn somewhat differently, for example, by placing on the non-"claim" side only those injunctions ordering a defendant to stop current activi-

ties that add to pollution (*e.g.,* depositing new hazardous substances), while leaving on the "claim" side all other injunctions, including those that direct the cleanup of sites from which hazardous substances, previously deposited, are currently contributing to pollution. But we believe that placing on the non-"claim" side all injunctions that seek to remedy on-going pollution is more faithful to the Supreme Court's teachings in both *Kovacs* and *Midlantic National Bank v. N.J. Dep't of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). It is difficult to understand how any injunction directing a property owner to remedy ongoing pollution could be a dischargeable "claim" if, as *Kovacs* instructs, the owner "may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions." 469 U.S. at 285, 105 S.Ct. at 711. Moreover, leaving such injunctions outside the category of dischargeable "claims" is entirely consistent with *Midlantic*'s holding that the Bankruptcy Code does not entitle a debtor to abandon property in violation of an environmental regulation "that is reasonably designed to protect the public health or safety from identified hazards." 474 U.S. at 507, 106 S.Ct. at 762 (footnote omitted).

■ 3. *Administrative priority.* The Bankruptcy Code accords an administrative priority to "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A) (1988). The District Court ruled that all clean-up costs assessed post-petition with respect to sites currently owned by LTV where there has been a pre-petition release or threatened release of hazardous wastes will be entitled to administrative priority. LTV and the unsecured creditors challenge this ruling, viewing it as an unwarranted attempt to convert pre-petition contingent claims into priority claims by the simple expedient of liquidating them, *i.e.,* incurring response costs and securing reimbursement. EPA contends that response costs paid during administration with respect to pre-petition releases or threatened releases are necessary to preserve the estate in the sense that they enable the estate to maintain itself in compliance with applicable environmental laws. The Equity Holders urge that decision as

to whether reimbursement for any response costs is entitled to administrative priority cannot be made until there has been a careful assessment of the facts peculiar to each payment.

The District Court drew support for its ruling from the Supreme Court's decision in *Midlantic*, which ruled that a bankruptcy trustee could not abandon property in contravention of state or local laws designed to protect public health or safety. If property on which toxic substances pose a significant hazard to public health cannot be abandoned, it must the follow, the Court reasoned, that expenses to remove the threat posed by such substances are necessary to preserve the estate. We agree, as have other courts considering the same issue. *See In re Wall Tube & Metal Products Co.*, 831 F.2d 118, 123–24 (6th Cir. 1987); *In re Peerless Plating Co.*, 70 B.R. 943, 948–49 (Bankr.W.D.Mich.1987); *In re Stevens*, 68 B.R. 774, 783 (D.Me.1987); *see also In re Smith–Douglass, Inc.*, 856 F.2d 12, 17 (4th Cir.1988).

LTV's argument that EPA should not be able to obtain administrative priority for a contingent claim by liquidating it overlooks the fact that EPA is doing more than fixing the amount of its claim; it is acting, during administration of the estate, to remedy the ongoing effects of a release of hazardous substances. As the Government acknowledges in response to the contention of the Equity Holders, nothing in the District Court's ruling eliminates the obligation of notice and hearing before the allowance of a particular request for payment of an administrative expense. *See* 11 U.S.C. § 503(b)(1)(A) (1988). The District Court has ruled that response costs for post-petition remedial action qualify as administrative expenses; whether any particular item of cost is entitled to priority requires a particularized determination.

### Conclusion

The judgment of the District Court is affirmed. No costs.