CARDAMONE, Circuit Judge:
This is an appeal in a case arising out of the bankruptcy of The LTV Corporation and its 66 subsidiaries (collectively LTV, debtors, or appellees). LTV is involved in a variety of industries, including steel, energy, and aerospace. It filed for Chapter 11 protection on July 17,1986 (the filing date), and the subsequent reorganization has proven to be one of the longest, most complex, and most extensively litigated bankruptcy proceedings in history. Numerous lawsuits arising from LTV’s troubles have implicated a myriad of social, political and economic issues and have touched upon legal subjects running the gamut from ERISA to environmental law. See, e.g., Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (holding that PBGC restoration of pension plans previously terminated was permissible); United States v. LTV Corp. (In Re Chateaugay Corp.), 944 F.2d 997 (2d Cir.1991) (deciding that certain CERCLA claims are prepetition claims if response costs arose in relation to prepetition pollution).
The appeal before us now concerns but a small piece of the puzzle surrounding LTV’s bankruptcy reorganization. We are asked to decide two questions. First, we must determine whether the debtors acted appropriately when, in their proffered plan of reorganization, they classified the Aetna Casualty and Surety Company’s (Aetna, surety, or appellant) surety-reimbursement claims in a separate category from LTV’s unpaid workers’ compensation obligations. Second, we must decide whether Aetna’s claims for surety reimbursement are entitled to the priority ordinarily given to excise taxes. This second issue requires us to decide whether to implement a renumbering in an Act of Congress according to its literal terms even when doing so would lead to absurd and unintended results and require the enforcement of an obvious cross-referencing error. To resolve this issue demands construction of the subject section of the Bankruptcy Code and is a matter we unravel in the discussion in Part II.
The United States District Court for the Southern District of New York (Patterson, J.), acting in its appellate capacity in bankruptcy matters, rejected both of Aetna’s contentions, In Re Chateaugay, 177 B.R. 176 (S.D.N.Y.1995) (Chateaugay II), and affirmed the decision of the Bankruptcy Court for the Southern District of New York (Conrad, J.), In Re Chateaugay, 155 B.R. 625 (Bankr.S.D.N.Y.1993) (Chateaugay I).
BACKGROUND
LTV filed for bankruptcy protection pursuant to Chapter 11 of the Bankruptcy Code on July 17, 1986. At the same time, LTV Steel, a subsidiary, successfully moved for authority to meet certain employee-related obligations. The bankruptcy court ordered that the debtors “be ... authorized and empowered to pay all employees’ workers’ compensation, ‘black lung’ and related benefits and claims which arose or accrued prior to the Filing Date.” Chateaugay II, 177 B.R. at 178. This allowed LTV to satisfy prepetition workers’ compensation obligations. In accordance with the court order LTV made payments in those states where it maintained self-insured status and defaulted in those states where other sources of payment existed. This arrangement ensured that LTV’s injured workers would not be left without compensation.
Long before the filing date, Aetna had issued numerous surety bonds on behalf of *946 LTV, including workers’ compensation bonds, to secure payment of LTVs employee obligations under the laws of Kentucky, Minnesota, New York, Pennsylvania, Washington, and West Virginia (collectively the bonded states). Aetna, in effect, guaranteed payment of LTVs obligations in these bonded states. Therefore, when LTV filed for bankruptcy and subsequently halted workers’ compensation payments in the bonded states, Aetna, as surety, was obliged to pay $38 million to cover LTVs prepetition workers’ compensation claims. Chateaugay II, 177 B.R. at 178. In four of these states (Minnesota, New York, Washington and West Virginia), had Aetna failed to pay LTVs obligations, the states would have become responsible (under state law) for paying the claims of LTVs injured workers. Id. at 183 & n. 4.
LTV filed its Second Modified Joint Plan of Reorganization and Second Modified Disclosure Statement (the plan) on February 26, 1993. The plan is nearly 200 pages long and addresses all aspects of LTVs filing and reorganization, including such topics as environmental problems, labor issues, securities law, and financial projections. It provides for the reorganization of four groups of LTV companies — -the Parent Group and the Steel, Aerospace, and Energy Groups — and for liquidation of the AM General Group.
For our purposes, the only relevant portion of the plan concerns its treatment of the prepetition workers’ compensation claims that arose from three different parts of LTV — the Parent Group, the Steel Group, and the Energy Group. Unpaid employee claims from each of these three groups were placed into a single class — 6.10, 6.20, 6.50, respectively. Already-paid injured workers — and creditors asserting claims derivatively through them — were placed in a separate class for each group — 5.10, 5.20, and 5.50, respectively. Classes 6.10, 6.20, and 6.50, composed of the unpaid workers’ claims, received priority status and were unimpaired. Classes 5.10, 5.20, and 5.50, including those claiming derivatively through the paid workers’ claims, remained impaired.
Before the plan was filed, all the workers’ compensation demands were classified as general unsecured claims. Under the plan, unpaid workers are guaranteed full payment, while paid workers and creditors with derivative claims — including sureties like Aetna— are not. Payment to them will be in the same form as payment to other general unsecured creditors: certificates for shares of new LTV common stock issued after confirmation of the plan. Ultimately- — should Aetna’s objections to the plan be unavailing— Aetna will be paid only a portion of its original claim — somewhere between 37 and 44 cents on the dollar.
This classification system means that the debtors’ plan provides special treatment to workers. An LTV Steel industrial relations executive explained that “[a]ny failure to satisfy workers’ compensation obligations would ... elicit a negative reaction from the unions representing [LTVs] employees.” LTV views the cooperation of their workforce as “an absolute necessity for the viability of the restructured company.” Chateaugay II, 177 B.R. at 186. As Aetna and other sureties will not play a similarly vital role in reorganization, their claims were not classified with the claims of unpaid workers.
In the bankruptcy court, and then on appeal to the district court, Aetna objected to the plan. It asserted that separate classification of its claims and the claims of the unpaid workers was improper. Aetna also argued that some of its claims should have received excise tax priority under the Code. It also sought administrative expense priority for these reimbursement claims. As noted, the bankruptcy and district courts denied the surety’s objections. See Chateaugay II, 177 B.R. at 187. Aetna now appeals, challenging the adverse decisions with respect to classification and excise tax priority. We affirm.
DISCUSSION
Initially, we note that a district court order issued in its appellate capacity is subject to plenary review. We examine the factual findings made by the bankruptcy court under the clearly erroneous standard and its legal conclusions de novo. Liona Corp. v. PCH Assocs. (In Re PCH Assocs.), 949 F.2d 585, 597 (2d Cir.1991).
*947 I Classification of Aetna’s Claims
Aetna’s first argument is that its claims must be paid in full because the plan guarantees full satisfaction of the debtors’ workers’ compensation obligations. According to the surety, its claims are the workers’ claims through subrogation. Appellant insists that as a result of its payments as a surety, it was subrogated to the rights of LTV’s workers. As LTV’s plan proposes to pay all workers’ claims in full, Aetna seeks full payment as a subrogee of those workers whose claims it paid. Appellant also asserts that the plan improperly classifies its claims so as to deprive it of full payment. The questions of subrogation and classification are analytically distinct, and we discuss them separately.
A. Subrogation
Since Aetna was LTV’s surety, its claim is initially governed by 11 U.S.C. § 509 (1994), entitled “Claims of codebtors.” This Code provision is the statutory enactment of the long-standing doctrine of equitable subrogation. In equity, the rule was that “[w]here property of one person is used in discharging an obligation owed by another ... under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee.” Restatement of Restitution § 162 (1936). Subrogation is one of the oldest of equitable doctrines. Under its rule, one “compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other.” American Surety Co. v. Bethlehem Nat’l Bank,. 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941).
Although the Bankruptcy Code and not the law of equity governs the dispute before us, cf. Rubenstein v. Ball Bros., Inc. (In Re New Eng. Fish Co.), 749 F.2d 1277, 1280 (9th Cir.1984) (state law applies unless Code provides otherwise), it is nonetheless familiar law that “[wjhere Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.” NLRB v. Amax Coal Co., 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981). Without a specific statutory definition of subrogation, principles of equitable subrogation provide background for an analysis of the Code.
Section 509(a) of the Code states
Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.
Section 509(c), relied on by the district court, states
The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor’s claim, until such creditor’s claim is paid in full, either through payments under this title or otherwise.
Aetna maintains § 509(a) requires that it be subrogated to the rights of the workers it paid. Without its contributions, appellant continues, these workers would not have been paid, and thus would have been considered unpaid workers eligible for priority status under the plan. Through the doctrine of subrogation, Aetna concludes, it should therefore receive payments from the bankrupt estate as if it were an unpaid worker. Appellant labels its claims in fact as “identical” to those of the unpaid workers.
The district court decided that the surety’s claims were not identical to LTV’s unpaid workers’ claims. Relying on the reasoning of the bankruptcy court, it distinguished, under the terms of § 509(e), the claims of the individual workers from the workers’ compensation claims held by Aetna. Chateaugay II, 177 B.R. at 186. According to subsection (e), the surety’s rights are subordinate to the rights of unpaid employees until all employees are paid in full.
*948 The district court’s approach demonstrates that in some circumstances appellant’s claims are legally distinguishable from those of the unpaid workers. After all, if LTV’s primary creditors (the workers) were not paid in full, § 509(c) would then bar Aetna from receiving full payment. However, the district court did not decide that § 509(c) applied directly to these facts. That is, as the plan guarantees full payment to the primary creditors, § 509(c) has no apparent application. If it did apply, Aetna’s ability to be subrogated in any way would be in question. But it cannot be doubted that appellant is subrogated to the claims or rights of the workers it paid. Hence, § 509(c) shows a theoretical difference between the respective claims, but this subsection of the Code does not provide a basis in the instant case to avoid applying the general rule of subrogation set forth in § 509(a).
As the surety made its payments after the filing date — subsequent to the commencement of the bankruptcy proceeding— § 509(a) applies to this case. See 3 Lawrence P. King, Collier on Bankruptcy ¶ 509.02, at 509-6 (15th ed. 1996) (Collier on Bankruptcy). Also, because the surety has made full payment of LTV’s workers’ compensation obligations in the bonded states, we believe it qualifies as a subrogee under § 509(a). LTV contends that since Aetna’s payments will continue into the future for several years, it has not in fact made full payment. But Aetna’s promise to make future payments is sufficient to constitute payment under § 509(a) since its promise effectively discharged the debt. See Feldhahn v. Feldhahn, 929 F.2d 1351, 1354 (8th Cir.1991) (“payment in the technical sense is not required,” it is immaterial how surety satisfied its obligation, so long as it discharged it); Pandora Indus., Inc. v. Paramount Communications, Inc. (In Re Wingspread Corp.), 145 B.R. 784, 788 (S.D.N.Y.1992) (same), aff'd without written opinion, 992 F.2d 319 (2d Cir.1993); see also Salzman v. Holiday Inns, Inc., 48 A.D.2d 258, 262, 369 N.Y.S.2d 238 (4th Dept.1975) (in equitable subrogation “person seeking subrogation must have made a payment, or had his funds or other property applied to discharge another’s obligation”), modified on other grounds, 40 N.Y.2d 919, 389 N.Y.S.2d 576, 358 N.E.2d 268 (1976).
But this does not mean that Aetna can insist on the same treatment as an unpaid worker. Appellant’s argument in this regard fails to recognize whose rights devolved to it by subrogation when it paid LTV’s obligations in the bonded states. As noted, before the plan was filed, all workers’ compensation claims — those asserted directly by unpaid workers and those now asserted derivatively by sureties like Aetna — belonged in the same category of general unsecured claims. This result followed from the fact that workers’ compensation obligations are prepetition claims without statutory priority in reorganization. See St. Paul Fire & Marine Ins. Co. v. REA Express, Inc. (In Re REA Express, Inc.), 442 F.Supp. 71, 74 (S.D.N.Y.1977), aff'd urithout written opinion, 591 F.2d 1332 (2d Cir.1978).
In order to promote labor harmony, the plan gave priority status and a promise of full payment to unpaid workers. Priority status, in combination with Aetna’s surety payments guaranteed full payment to all injured LTV workers. Yet, the plan did not give priority status to the demands of workers from the bonded states. As they had already been paid, no priority was needed to guarantee their workers’ compensation payments. Hence, Aetna was subrogated to the claims of workers in the bonded states, and those workers’ claims never themselves obtained priority status. And so appellant, standing in their shoes, likewise was unable to obtain priority as a subrogee; instead it remained a general unsecured creditor with respect to the payments it had made.
This conclusion accords with the historical understanding of subrogation as an equitable remedy. It is no injustice to limit the surety’s recovery to that of an unsecured general creditor. Understanding the risks of serving in that capacity, presumably it incorporated those risks into its rates when issuing policies and binding itself as surety. One of the risks was that its insured would go bankrupt and would be unable to meet its financial obligations to its employees. The surety would then be obliged to pay the employees and would be left holding a claim in a reorga *949 nization, in which recovery is uncertain. Having known these risks, Aetna cannot now declare it has been treated unfairly in the reorganization. Moreover, it is no worse off after the plan than it was before. Appellant remains a general unsecured creditor and will be treated no differently from other general unsecured creditors. Had LTV not esteemed labor harmony so highly and decided against giving priority status to the workers in the non-bonded states, Aetna would have no argument on its perceived inequitable treatment.
In sum, the subrogation argument fails not because Aetna fails to qualify as a subrogee under § 509(a); it does qualify. Rather, § 509(a) does not give Aetna priority status inasmuch as the claims to which Aetna was subrogated never themselves enjoyed priority status prior to the institution of the plan and were not given such status under the plan. Appellant may not use the plan to piggyback onto the claims of the unpaid workers, and its contentions fail to appreciate that when it paid the workers in the bonded states, it was subrogated only to those claims.
B. Classification
We next decide if the classification arrangement — one that placed Aetna’s and the unpaid workers’ claims in different classes— is appropriate under the Code. Appellant points to 11 U.S.C. § 1122 (1994) to support its theory that the plan impermissibly classifies it with general unsecured creditors rather than with the unpaid workers.
Section 1122(a) states that, except for reasons of administrative convenience, “a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.” We have explained, in construing this language, that separate classification of unsecured claims for the sole purpose of creating an impaired assenting class is not permitted. Rather, to warrant having separate classification of similar claims, the debtor must advance a legitimate reason supported by credible proof. See Boston Post Road Ltd. Partnership v. FDIC (In Re Boston Post Road Ltd. Partnership), 21 F.3d 477, 483 (2d Cir.1994), cert. denied, — U.S. -, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995). Thus, classification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason. Aetna’s demands eoncededly are different from the unpaid workers’ claims. The workers in the bonded states have already been paid in full. In contrast, the workers in the non-bonded states will never be paid in full unless their claims receive priority status. This is a crucial distinction between appellant’s claims and those of the unpaid workers.
Yet, even were the claims similar (because both arise from LTVs workers’ compensation obligations), their similarity does not pose an insurmountable barrier to separate classification. To show that there is a legitimate reason for treating the claims of unpaid workers differently than those of sureties, LTV proffered the affidavit of its Vice President of Industrial Relations of the LTV Steel Company, Inc., who related the history of the company’s workers’ compensation obligations and explained why these payments are crucial to its future success. LTVs officer explained how such benefits are considered by its employees to be an entitlement under state law and how these benefits often are the employees’ only form of wage replacement. Were the debtor unable to satisfy workers’ compensation obligations, he added, the unions representing LTVs employees would react so negatively as to jeopardize peaceful labor relations and thereby cast into doubt LTVs ability to secure sales contracts from customers.
At the same time, the officer continued, partial satisfaction of Aetna’s claims would not visit these harmful effects on LTV and paying the surety in full will not contribute to labor peace or to any other important policy goal in the reorganization. This illuminates the distinction between the two sets of claims and establishes LTVs legitimate reason for classifying them separately. Congress gave reorganizing debtors considerable flexibility in their treatment of general unsecured creditors to position themselves for future eco *950 nomic viability. See Travelers Ins. Co. v. Bryson Properties, XVIII (In Re Bryson Properties, XVIII), 961 F.2d 496, 502 (4th Cir.) (explaining that § 1122 “grants some flexibility in classification of unsecured claims”), cert, denied, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); see also 5 Collier on Bankruptcy ¶ 1122.04, at 1122-20. The debtors want to use that Code-given flexibility to facilitate a reorganization that will leave LTV strong and successful, a goal consonant with the purpose of § 1122.
Further, the bankruptcy court found that LTV did not impermissibly design this plan solely to engineer an assenting impaired class. Chateaugay I, 155 B.R. at 631; see Boston Post Road, 21 F.3d at 482; Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In Re Greystone III Joint Venture), 995 F.2d 1274,1279 (5th Cir.) (applying rule that similar claims should not be classified differently to gerrymander a plan to achieve an affirmative vote on reorganization plan), cert, denied, 506 U.S. 821,113 S.Ct. 72, 121 L.Ed.2d 37 (1992). LTVs proffered business justification for giving priority only to unpaid workers and not to paid workers and those claiming derivatively through them (like Aetna) was found legitimate by the bankruptcy and district courts, see Chateau-gay I, 155 B.R. at 631-32; Chateaugay II, 177 B.R. at 187. We have no reason to suppose that the finding that the proffered business reasons were legitimate was clearly erroneous. Hence, the debtor may place Aetna’s claims in a different class from the unpaid workers’ claims.
Appellant makes other related arguments. It wrongly suggests that the plan bases classification on the identity of the claims’ owner. Aetna’s claims are treated differently only to the extent that they are different; its demands are those of workers from bonded states who have already been paid. When appellant asserts those claims derivatively, it is necessarily limited to what the plan provides for paid workers—the status of general unsecured creditors and the appropriate stock payments. This distinction is unrelated to the identity of who owns the claims. Moreover, the legal basis underlying Aetna’s claims arises from a different source than those asserted by the unpaid workers. The former derive from § 509(a) of the Code, which incorporates an equitable doctrine; the latter are creatures of state statutes designed to benefit workers and employers. The claims, although undoubtedly similar, cannot be viewed as “identical” for purposes of analyzing their classification in the plan, nor is that classification based solely on the claimants’ identity.
Aetna relies heavily on Wingspread, 145 B.R. 784, but to no avail. Wingspread involved the right of a guarantor of a debt- or’s obligation under a lease to recover payments it made to a creditor after the debtor elected to assume the lease. The power to assume a lease in bankruptcy is an exceptional one, and 11 U.S.C. § 365(b) requires that the debtor cure all defaults before being allowed to assume. In Wingspread, the debtor attempted to avoid its obligation to cure by having its guarantor make payments and subsequently rejecting the requirement that it pay the guarantor according to § 365(b). In the instant case, the Code does not require payment of Aetna in order to ratify the plan. Wingspread is therefore inapposite. Rather, the case at hand involves the creation of a priority to preserve labor peace.
Appellant raises, in addition, the specter that the view we adopt will interfere with the bankruptcy claims trading market by adding uncertainty to the rights of subrogees. This specter is more shadow than substance. Our decision only limits a subrogee to that for which it bargained. Aetna began the bankruptcy process as the holder of general unsecured claims. Anyone who would trade for such demands should know the uncertain (and often limited) value they represent. Appellant never explains why a party with standing only as an unsecured general creditor has a right to expect that its claim will be fully satisfied in a reorganization. That the debtors’ plan ultimately gave priority only to those claims originally held by workers that were not otherwise paid will therefore have no effect on the claims trading market.
*951 In short, Aetna was subrogated only to the rights of the workers it paid — the workers in the bonded states. It cannot now assert a priority given in the plan to unpaid workers. Further, as LTV had a legitimate business reason — promoting harmonious labor relations — to categorize separately the claims of the unpaid workers and the paid workers (and those claiming derivatively through them), the plan’s classification arrangement is a proper one.
II The Excise Tax Priority
Aetna’s second challenge is to the denial of its request that it be accorded excise tax priority. Some claims, as a matter of law under the Code, are entitled to priority in a reorganization. One such claim, described currently at § 507(a)(8)(E) (1994), is an unsecured claim of a governmental unit for an excise tax on a prepetition transaction. The district court ruled that LTVs workers’ compensation obligations are excise taxes entitled to priority under this provision. Chateaugay II, 177 B.R. at 184. In so holding, the district court relied on a four-prong test used in County Sanitation Dist. No. % v. Lorber Indus. (In Re Lorber Indus.), 675 F.2d 1062,1066 (9th Cir.1982), which we have since adopted. See LTV Steel Co. v. Shalala (In Re Chateaugay Corp.), 53 F.3d 478, 498 (2d Cir.1995).
We recognize that without the surety’s payments to LTV employees in Minnesota, New York, Washington, and West Virginia, those states would have been responsible under state law for meeting LTV’s workers’ compensation obligations. In addressing the question whether Aetna could claim priority status, the district judge, for reasons with which we substantially agree, concluded that § 507(d) bars Aetna from claiming priority status through subrogation. Because our interpretation of § 507(d) avoids deciding whether workers’ compensation payments are excise taxes under § 507(a)(7)(E), we express no judgment on the district court’s reasoning on that issue. We do pause to note, however, that Aetna’s claim to excise tax priority requires that it be subrogated to the rights of some of the bonded states to payment. Aetna argues that if it had defaulted on its workers compensation payments to the workers (which it did not), these states would have made the payments. Aetna argues that this hypothetical scenario qualifies as a contingent or unmatured claim pursuant to Code § 101(5)(A), which provides that a “ ‘claim’ means ... a right to payment, whether or not such right is ... contingent [or] unmatured.”
Aetna’s claim is not a contingency; it is a nullity. Aetna made the payments, and as a result the states did not pay and have no claim against either LTV or Aetna. Contingent claims are designed to include claims that may reasonably occur in the future, not claims that could have occurred but in fact did not and cannot now occur. The fact of Aetna’s payment foreclosed any possibility that it would default.
Difficulties have arisen in interpreting § 101(5)(A) with regard to “unmatured” claims, but not with regard to unmaturable claims. Courts have split, for example, over the claims of tort victims who were exposed to hazardous materials but do not yet manifest symptoms. See LTV Corp., 944 F.2d at 1004 (collecting cases). The harm to the tort claimant may occur in the future. Aetna’s default on payments it already paid can never occur, so the bonded states do not have a contingent or unmatured claim to which Aetna can subrogate itself.
More fundamentally, Aetna would not have a claim even if it had actually defaulted because it would have no right to payment. If the states paid the workers, then the states might be subrogated to the rights of the workers against Aetna. Aetna would not somehow become subrogated to the rights of the states. Subrogees obtain their rights to payment by making payments, not be defaulting. Still, having made these observations, we decide the issue solely'by construing § 507.
A. Text and History of § 507
Construction of § 507 necessarily begins with its text. See Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). The section contains four subdivisions, (a) *952 through (d). Together these subsections specify which claims are entitled to priority in bankruptcy distribution and the order of their priority. As stated, the current § 507(a)(8)(E) allows a priority for “unsecured claims of governmental units ... to the extent that such claims are for ... an excise tax” on most prepetition transactions. Originally, this provision was numbered subsection (a)(0)(E). Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, 92 Stat. 2549, 2583-84 (1978) (emphasis supplied). When the Code was first enacted in 1978, subdivision (d) of § 507 provided that “[a]n entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection (a)(3), (a)(4), (a)(5), or (a)(6) of this section is not subrogated to the right of the holder of such claim to priority under such subsection.” 92 Stat. at 2585 (emphasis supplied). Hence, under the original language of § 507(d), Aetna, as a subrogee, would not have been entitled to excise tax priority.
Congress later made several alterations to the Code by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 98 Stat. 333 (1984) (1984 Act). Most relevant to our inquiry is the legislature’s decision to insert a new fifth subsection, § 507(a)(5), which gave priority status to certain unsecured claims by grain farmers and fishermen. See 1984 Act § 350, 98 Stat. at 358. Along with this insertion, Congress renumbered the subsection concerning excise tax priority designating it as (a)(7) instead of (a)(6). Id. Unfortunately, and for an unknown reason, subsection (d) was not similarly adjusted to account for the renumbering accompanying the newly-added priority given to grain farmers and fishermen. Since § 507(d), by its terms, then only applied to subsections (a)(3) through (a)(6), according a literal reading to the statute, subiogees could now obtain priority for their claims because (a)(6) had been, by reason of the new insertion, renumbered (a)(7), and thus was outside the- purview of § 507(d).
That this was an unintended and anomalous result soon became apparent. A leading bankruptcy treatise explained that despite the statutory language, subsection (d) still barred priority status for subrogated tax claims under what is now § 507(a)(8). It noted that this subsection was erroneously referred to in the statute as (a)(6) and that “Congress, in enacting the 1984 Amendments, failed to correct the cross-references to section 507(a) that appear in other Code provisions to account for the 1984 Amendments.” 3 Collier on Bankruptcy ¶ 507.07, at 507-50. Numerous .courts — those most experienced in working with the Bankruptcy Code — agreed, believing the change in statutory language to be the result of “a perceived mistake in congressional drafting.” Creditor’s Comm. v. Massachusetts Dep’t of Revenue, 105 B.R. 145, 149 (D.Mass.1989); see also In Re Trasks’ Charolais, 84 B.R. 646, 652 n. 9 (Bankr.D.S.D.1988) (describing failure to renumber § 507(d) references “a technical error”); In Re Tentex Marine, Inc., 83 B.R. 530, 534 (Bankr.W.D.Tenn.1988) (“This re-numbering was not changed in 507(d), as it obviously should have been.”); In Re Gaumer, 83 B.R. 3, 4 (Bankr.S.D.Ohio 1988) (“The omission of § 507(a)(7) from the proscription embodied in § 507(d) was the result of a technical or typographical error in the statute.”).
Congress eventually corrected the inconsistency in a short technical amendment. Bankruptcy Reform Act of 1994, Pub.L. No. 103-394, § 501(d)(ll)(B), 108 Stat. 4106, 4145 (1994) (1994 Act); see also 3 Collier on Bankruptcy ¶ 509.02, at 509-8 & n. 8h. It directed that § 507(d) be amended to include subsections (a)(6) through (a)(9). With the excise tax priority subsection included in this range (elsewhere renumbered from subsection (a)(7) to its current subsection, (a)(8)), the anomaly was resolved. The legislation nonetheless provided that the technical amendments, like most of the amendments in the 1994 Act, did not apply to cases pending on the statute’s effective date of October 22, 1994. See 1994 Act § 702(a), 108 Stat. at 4150. The 1994 Act therefore does not contain a textual command barring Aetna’s claim of excise tax priority.
B. Statutory Construction
We turn now to decide the meaning of § 507 of the 1984 Act. Appellant urges we adhere strictly to the section’s literal lan *953 guage. LTV argues we should not infer a change in the effect of § 507 without evidence that one was intended.
We start with the presumption that a statute should be construed to mean exactly what it says, see Connecticut Nat’l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992), and that what is plain on the face of a statute is not required to be stated elsewhere. Congress need not expressly discuss in the legislative history every possible application of a law it enacts. Moskal v. United States, 498 U.S. 103, 111, 111 S.Ct. 461, 466-67, 112 L.Ed.2d 449 (1990).
At the same time, we cannot infer that Congress, in revising and renumbering § 507(a) to accommodate grain farmers and fishermen, intended to change the effect of the reference to subsection (a)(6), which was renumbered as (a)(7), in subsection (d). The reason such an inference cannot be drawn is that an aim to change the effect of the reference to (a)(6) is not clearly expressed on the face of the statute or anywhere else for that matter. When Congress revises and renumbers existing laws, a court should not infer any legislative aim to change the laws’ effect unless such intention is clearly expressed. See Finley v. United States, 490 U.S. 545, 554, 109 S.Ct. 2003, 2009-10,104 L.Ed.2d 593 (1989). Again, if this renumbering had as its purpose to eliminate the longstanding law that prevents subrogation with respect to tax creditors’ right of priority, it is not unreasonable to expect that some expression of such a purpose would be found in the 1984 Act’s language or legislative history. See American Hosp. Ass’n v. NLRB, 499 U.S. 606, 613-14, 111 S.Ct. 1539, 1543-44, 113 L.Ed.2d 675 (1991).
We recognize that during the drafting process an error may creep in, statutes are not drafted with mathematical precision, and should be construed with some insight into Congress’ purpose at the time of enactment. See Lehigh Valley Coal Co. v. Yensavage, 218 F. 547, 552-53 (1914) (L.Hand, J.), cert. denied, 235 U.S. 705, 35 S.Ct. 282, 59 L.Ed. 434 (1915). But no House or Senate report accompanied the 1984 Act. Also, the published statements of legislative leaders are devoid of any suggestion that it was Congress’ purpose to change the rules pertaining to subrogation and excise tax priority. See Statements By Legislative Leaders, 1984 U.S.C.C.A.N. 576, 576-606. Instead, the relevant amendments were described as “relating to a grain storage facility bankruptcy.” Id. at 576 (statement of Rep. Rodino).
Ordinarily, little can be presumed from the absence of legislative history. In determining what Congress means, courts generally “cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark.” Harrison v. PPG Indus., Inc., 446 U.S. 578, 592, 100 S.Ct. 1889, 1897, 64 L.Ed.2d 525 (1980). In Chisom v. Roemer, 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), however, the Supreme Court was asked to resolve a challenge to § 2 of the Voting Rights Act of 1965 and to decide whether that Act protected minorities’ right to vote in state judicial elections, despite the inclusion in the Act of the phrase “representatives of their choice.” If Congress had intended to exclude vote-dilution claims in judicial elections from the Act’s coverage, the Court held, it would have made it explicit in the law or it would have come to light in the legislative history. Id. at 396, 111 S.Ct. at 2365. Despite Harrison, the Court likened Congress’ silence to “the dog that did not bark.” Id. at 396 n. 23, 111 S.Ct. at 2364 n. 23.
Although, as noted, little ordinarily may be read into the absence or brevity of legislative history, yet, in resolving a statutory mystery, courts must often look for guidance wherever it may be found. In those rare situations, as here, where it appears plain that an error in drafting has occurred, so that a literal construction would make a dramatic change in longstanding law, it is both sensible and permissible for judges to consider, in conjunction with other factors, Congress’ complete silence on the literal effect of the change.[1] See Harrison v. PPG *954 Indus., 446 U.S. at 602, 100 S.Ct. at 1902 (Rehnquist, J., dissenting). After all, Congress should know that courts will not infer a change in statutory meaning when Congress simply revises, renumbers, or consolidates a statute, absent a clear expression of legislative purpose, see Finley, 490 U.S. at 554, 109 S.Ct. at 2009-10 (citing Anderson v. Pacific Coast S.S. Co., 225 U.S. 187, 199, 32 S.Ct. 626, 630, 56 L.Ed. 1047 (1912)). Moreover, no canon of construction bars courts from using common sense and construing a law as not saying what it obviously does not mean.
 In light of the technical error— conceded as such by Congress itself in the 1994 Act — in failing to renumber the references in § 507(d) consistently with § 507(a), we believe this omission was a scrivener’s error resulting from inadvertence. Courts construing Acts of Congress are entitled to “ ‘repunctuate, if need be, to render the true meaning of the statute.’ ” United States Nat’l Bank v. Independent Ins. Agents, 508 U.S. 439, 462, 113 S.Ct. 2173, 2186, 124 L.Ed.2d 402 (1993) (quoting Hammock v. Farmers Loan and Trust Co., 105 U.S. 77, 84-85, 26 L.Ed. 1111 (1881)). The failure here to correct the cross-references in § 507(d) is akin to an error in punctuation— “a simple scrivener’s error, a mistake made by someone unfamiliar with the law’s object and design.” Id. Thus, the longstanding meaning of § 507 regarding subrogation of excise tax priority rights is and remains clear under the 1984 legislation that we construe, even though that legislation was inartfully drafted.
That Congress did not state that the technical amendments in the 1994 Act were to be applied retroactively — while some non-technical amendments in the 1994 Act were to be so applied, see 1994 Act § 702(b)(2)(B), 108 Stat. at 4150 — does not constitute a directive from Congress to deem a technical drafting error in the 1984 Act to be law. By labelling the 1994 change a “technical correction,” Congress recognized that the 1984 amendment did not purport to change the substantive meaning of the law. The 1994 Act simply clarifies that statute’s language and in so doing confirms our conclusion that the statute contained a scrivener’s error. See H.R.Rep. No. 835, 103d Cong., 2d Sess. 59 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3368 (explaining that § 501 and other provisions in Title V of the 1994 Act are “technical correction to the Bankruptcy Code”).
To rule otherwise in this case would lead to unintended and absurd results (6(a) priority rights may be subrogated from 1984 to 1994, but not before 1984 or after 1994) — • results at odds with the plan of the 1984 Act. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (plain meaning of legislation is conclusive, except where literal application yields a result “demonstrably at odds with the intention of its drafters”). As a consequence, we affirm the district court’s conclusion that § 507(d) prevents Aetna from claiming excise tax priority as a subrogee.
CONCLUSION
For the foregoing reasons, the judgment below is affirmed.

. The recurring reference to “the dog that did not bark" comes from the Sherlock Holmes classic. Silver Blaze. Arthur Conan Doyle, Silver Blaze, in The Complete Sherlock Holmes 335 *954 (1930). In that tale, Sherlock Holmes solved a murder and the disappearance of a famous race horse, Silver Blaze. And while it is true that the dog guarding the stable where the horse was kept did not bark, this clue was not the first or even the most important one. Other clues included (1) curried mutton, (2) a surgeon’s knife, (3) a bit of candle and matches, (4) a milliner’s bill, and (5) several lame sheep. Id. at 349-50. But the failure of the dog to bark — its silence when it would ordinarily be heard — was a clue the legendary detective considered in solving the crime. In other words, while the dog’s failure to bark would ordinarily and independently hold little significance, in this context, Holmes found it relevant. Similarly, in this special context, the absence of legislative history is significant. See E. Norman Peterson Marital Trust v. Commissioner, 78 F.3d 795, 796 (2d Cir.1996) (recognizing the importance of context in construing statutes).