**In re McCRORY CORPORATION, et al., Debtors.**

**Bankruptcy No. 92–B–41133(CB).**

United States Bankruptcy Court, S.D. New York.

Nov. 20, 1995.

Fried, Frank, Harris, Shriver & Jacobson, New York City by Matthew M. Weissman and John Dellaportas, for Debtor.

Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A. by Eric W. Sleeper, Newark, New Jersey, for Pegasus Industrial Associates.

### DECISION ON ADMINISTRATIVE EXPENSE PRIORITY STATUS OF ENVIRONMENTAL CLEAN UP COSTS

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

This Court is asked to determine whether environmental clean-up costs incurred post-petition under the New Jersey Environmental Cleanup Recovery Act ("ECRA")[1], N.J.Stat.Ann. § 13:1K–6 to –35 (West 1991), resulting from debtor's pre-petition actions are entitled to administrative expense priority pursuant to 11 U.S.C. §§ 503 and 507.

### FACTS

McCrory Corporation ("McCrory") leased certain real property in Jersey City, New Jersey (the "Property") from Pegasus Industrial Associates ("Pegasus"). The Property, which included a truck terminal, was used by McCrory as a warehouse and distribution facility. Under the terms of the lease, McCrory agreed to comply with all Federal, State, and local environmental laws and to clean-up any environmental contamination resulting from the discharge of hazardous substances at the Property during the term of the lease. McCrory was further obligated to indemnify Pegasus for all claims stemming from any such discharges.

McCrory filed a Chapter 11 bankruptcy petition on February 26, 1992. Subsequently, McCrory moved to reject the lease with Pegasus pursuant to 11 U.S.C. § 365. Neither Pegasus nor any other party objected to the rejection and the court approved the lease rejection on July 13, 1992. At some point after filing its petition, but prior to rejection of its lease, McCrory ceased operations at the Property.

Upon McCrory's rejection of the lease, Pegasus hired Environmental Waste Management Associates ("Waste Management"), an environmental consulting firm[2], to assess the environmental contamination present at the site. This site assessment was commissioned in order to comply with ECRA, which requires that upon the closing of any industrial establishment or transfer of real property utilized in connection with hazardous substances, the owner or operator of the site must notify the New Jersey Department of

---

1. The statute was amended in 1993 and is now known as the Industrial Site Recovery Act. N.J.Stat.Ann. § 13:1K–6 to –35 (West 1991 & Supp.1995). The amendments do not affect our analysis.

2. Waste Management is certified by the New Jersey Department of Environmental Protection and Energy to perform environmental site assessments and certain remediation services.

Environmental Protection and Energy of any discharge of hazardous substances at the site and, if necessary, prepare a clean-up plan. N.J.Stat.Ann. § 13:1K–9.

Waste Management issued a report dated August 19, 1992 indicating several areas of environmental concern at the site, including petroleum stains and the existence of above-ground and underground storage tanks. Pegasus requested that Waste Management submit a proposal for services required to bring the site into compliance with ECRA. The preliminary clean-up report, which Waste Management issued on September 18, 1992, estimated the initial costs to be $11,920. The report called for the closing of the tanks, tank excavation and removal, and continuing site assessments. This initial report was based only on a walk-through inspection, and did not include the cost of waste removal. The parties were aware that the additional costs required to comply with ECRA could be significant. Indeed, the costs through May 31, 1995 have totaled approximately $101,524.87. Part of the additional cost stems from remediation required to eliminate soil contamination observed during the excavation process and the continued monitoring of the site.

On May 12, 1993, ten months after McCrory rejected the lease, Waste Management submitted the clean-up plan to the New Jersey Department of Environmental Protection and Energy. The clean-up plan provided for removal of storage tanks by June 7, 1993. The tanks were ultimately removed in July, 1993.

In September, 1992, after McCrory left the Property and before implementation of the clean-up plan, another entity commenced operations at the Property, also utilizing the truck terminal facility.

Pegasus filed a motion seeking entry of an order declaring that the environmental clean-up costs are entitled to administrative priority pursuant to 11 U.S.C. §§ 503 and 507 and requesting current payment of these expenses.

McCrory opposes the motion and maintains that because the estate no longer has an interest in the property and the claims are based on debtor's pre-petition activity, they are general unsecured claims.

There has been no evidence adduced that there was any discharge of hazardous substances at the Property post-petition, prior to the new tenant occupying the Property. Therefore, our analysis is limited to pre-petition actions, during the term of the lease, that resulted in post-petition clean-up costs.

## DISCUSSION

Administrative priority is accorded to those expenses that are "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. §§ 503(b)(1)(A) & 507(a)(1).

Claims for reimbursement of amounts expended on environmental clean-up costs arising from pre-petition activities are ordinarily considered general unsecured claims. *Burlington Northern R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 709 (9th Cir.1988); *Southern Ry. Co. v. Johnson Bronze Co. (In re Johnson Bronze Co.)*, 758 F.2d 137, 141 (3d Cir.1985).

Some courts, however, have accorded these claims administrative status. *Lancaster v. Tennessee Dep't. of Health & Env't (In re Wall Tube & Metal Products Co.)*, 831 F.2d 118 (6th Cir.1987); *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2d Cir.1991); *In re National Gypsum Co.*, 139 B.R. 397 (N.D.Tex.1992).

Most courts that have accorded administrative expense priority to a claim based on pre-petition action that gives rise to post-petition environmental clean-up costs have relied on the combined effect of the Supreme Court decision in *Midlantic National Bank v. New Jersey Dep't. of Envtl. Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), and the debtor's obligation to maintain or preserve estate property in compliance with state environmental laws based on, either or both, the requirement noted by the Supreme Court in *Ohio v. Kovacs*, 469 U.S. 274, 285, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985), or the requirements of 28 U.S.C.

§ 959(b)[3]. *Wall Tube*, 831 F.2d at 121–23. In *Midlantic*, the Supreme Court held that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Midlantic*, 474 U.S. at 507, 106 S.Ct. at 762. The *Kovacs* Court stated that anyone in possession of contaminated property must comply with the state's environmental laws. *Kovacs*, 469 U.S. at 285, 105 S.Ct. at 711. 28 U.S.C. § 959(b) also requires a trustee to "manage and operate" the estate's property in accordance with the valid law of the state in which the property is situated. The courts allowing administrative priority reason that if the state's relevant environmental law is one "designed to protect the public health or safety from identified hazards," *Wall Tube*, 831 F.2d at 122, *quoting Midlantic*, 474 U.S. at 507, 106 S.Ct. at 762, the trustee may not abandon the property, but rather must keep it in the estate. This implicates the reasoning of the *Kovacs* Court or § 959(b) which requires the trustee to maintain the estate's property in compliance with state laws. Therefore, these courts conclude, the trustee's continuing duty to comply with environmental laws and discharge any liability it may have under the environmental statute is an actual, necessary cost of preserving the estate. *Wall Tube*[4], 831 F.2d at 122 ("[I]f the ... trustee could not have abandoned the estate in contravention of the State's environmental law, neither then should he have maintained or possessed the estate in continuous violation of that same law."); *Chateaugay*, 944 F.2d at 1010 ("If property on which toxic substances pose a significant hazard cannot be abandoned, it must ... follow ... that expenses to remove the threat posed by such substances are necessary to preserve the estate."); *National Gypsum*, 139 B.R. at 413; *In re Stevens*, 68 B.R. 774, 781 (D.Me.1987).[5] It has also been held that these claims for post-petition costs based on pre-petition actions are not invalid attempts to convert pre-petition contingent claims into priority claims by liquidating them. The claimant is said to be doing more than just fixing the amount of the claim, rather, the claimant is "acting, during administration of the estate, to remedy the ongoing effects of a release of hazardous substances." *Chateaugay*, 944 F.2d at 1010.

Therefore, where the facts of the case warrant a finding that the *Midlantic* analysis would prohibit the trustee from abandoning the property, the liability for the clean-up costs cannot be avoided and remain with the estate, thus the costs incurred to remediate are actual, necessary costs of preserving the estate. *Chateaugay*, 944 F.2d at 1010.

McCrory argues that this analysis only applies when the clean-up costs stem from property in which the bankruptcy estate currently has an interest because if there is no such interest, there can be no finding that the clean-up costs are "actual, necessary costs of preserving the estate."

McCrory maintains that because it rejected the Pegasus lease, the estate has no inter-

---

**3.** 28 U.S.C. § 959(b) provides:

> (b) Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

**4.** While the *Wall Tube* court noted that the danger to the public health or safety present in the case arose because of the debtor's failure to remedy an environmental hazard rather than the trustee's attempt to exercise its abandonment power, the court nevertheless found that, under the circumstances of the case, the trustee could not have abandoned the property. *Wall Tube*, 831 F.2d at 122.

**5.** Another court, however, suggested a wider allowance of administrative priority for environmental claims. *Boyd v. Dock's Corner Assocs. (In re Great Northern Forest Products, Inc.)*, 135 B.R. 46, 61 (Bankr.W.D.Mich.1991). The *Great Northern* court asserted that administrative expense priority is accorded to any post-petition expenses resulting from pre-petition environmental damage. While the *Great Northern* court cited *Wall Tube* and *Chateaugay*, no reference was made to those cases' reliance on *Midlantic* or the abandonment limitation, which this Court believes is a significant aspect of the analysis, at least when considering claims based on damage to property that is no longer property of the estate.

est in the property and any costs to clean-up the property would not benefit the estate. In support, McCrory cites *Dant & Russell,* a case where the debtor no longer leased the property and the court found that damages caused during the pre-petition period were not entitled to administrative expense status. 853 F.2d at 709. Citing a list of cases that had allowed administrative expense priority, the *Dant & Russell* court noted that allowing administrative priority status was the appropriate result where the debtor's estate continued to own the property because then the expenses would benefit the estate.

Indeed most of the decisions allowing administrative status for these environmental claims have only addressed claims concerning property then owned by the bankruptcy estate. *Chateaugay,* 944 F.2d at 1009–10; *In re National Gypsum Co.,* 139 B.R. at 412–13; *see also, In re Synfax Mfg., Inc.,* 126 B.R. 30 (Bankr.D.N.J.1990) (court noted that clean-up costs associated with either property occupied by debtor post-petition or property where the debtor or trustee is disposing of assets of the estate are accorded administrative priority).

In contrast, Pegasus argues that even if the estate does not own the property, the clean-up costs are entitled to administrative expense priority. Pegasus relies on *Torwico Elecs., Inc. v. New Jersey Dep't of Envtl. Protection (In re Torwico Elecs., Inc.),* 8 F.3d 146, 151 (3d Cir.1993), and *Commonwealth of Pennsylvania v. Conroy,* 24 F.3d 568 (3d Cir.1994).

In *Torwico,* the Third Circuit held that the debtor's obligation to comply with state and federal environmental laws were not dischargeable claims. While the court did not address the issue of the priority of the expenses incurred, the court held that the debtor was required to conduct an environmental clean-up even though it was no longer a tenant at the contaminated property. The court found that the debtor's obligation ran with the waste and, although the debtor no longer leased the property, the waste it had generated was a continuing environmental hazard. Further, the debtor could not avoid its responsibility to comply with environmental laws. The Third Circuit did not specifi-

cally rely on *Midlantic* because *Midlantic* only addressed the issue of a trustee's abandonment of estate property. In *Torwico,* because the debtor's lease terminated and the debtor left the property years before filing its bankruptcy petition, the estate never acquired an interest in the property. The Third Circuit did, however, rely on *Chateaugay,* which, in turn, found its reasoning to be in complete accord with the *Midlantic* analysis of abandonment. *Chateaugay,* 944 F.2d at 1009. Thus, the *Torwico* court indirectly applied the *Midlantic* analysis to find that the debtor could not abandon its responsibility as to property that was no longer property of the estate.

In *Conroy,* the Third Circuit allowed the Pennsylvania Department of Environmental Resources to receive an administrative expense priority for its filed claim. The court found that the Pennsylvania statute in issue proscribed abandonment of hazardous waste. The court concluded that because the law was "a reasonable effort to promote public health or safety," the *Midlantic* analysis barred the debtor's attempt to abandon the property contaminated with the hazardous waste. *Conroy,* 24 F.3d at 569. The court found that because the debtor could not abandon the property, the state agency's effort to recover the funds it expended on the clean-up was merely an effort to recover costs that the debtor could not have avoided. Thus, citing *Chateaugay,* the court concluded that the expenses were necessary to preserve the debtor's estate. *Conroy,* 24 F.3d at 569–70.

Thus, most courts that have allowed administrative priority to claims based on pre-petition activity that result in post-petition clean-up costs have relied on the *Midlantic* abandonment analysis. If applying this analysis, the court found that the debtor could not abandon the property, then the resulting post-petition clean-up cost was an administrative expense. It follows that, if the debtor would be permitted to abandon the property, and the property in fact is no longer estate property, any clean-up cost based on pre-petition activity would not be entitled to administrative expense priority pursuant to §§ 503 and 507.

While *Borden, Inc., et al. v. Wells–Fargo Business Credit (In re Smith–Douglass), Inc.*, 856 F.2d 12, 17 (4th Cir.1988), at first appears to be contrary to this analysis, a more careful reading of the case supports this view. In *Smith–Douglass*, the court allowed abandonment of the property but, in dicta, indicated that environmental clean-up costs were administrative expenses. It is, however, not clear whether the court was referring to expenses based on pre or post-petition activity resulting in environmental harm. Additionally, the court's ensuing statement that if an estate has unencumbered assets, stricter compliance with environmental law is required before abandonment would be permitted, seems to imply that the clean-up costs are administrative expenses only if the estate does not abandon the property.

We, therefore, must decide if the *Midlantic* analysis would preclude McCrory from abandoning the property.

■ As we previously noted, in *Midlantic*, the Supreme Court found that a trustee may not abandon property to avert application of a state law "reasonably designed to protect the public health or safety from identified hazards." 474 U.S. at 507, 106 S.Ct. at 762. In *Midlantic*, the debtor had stored oil contaminated with highly toxic substances and a state environmental agency had ordered immediate cessation of operations at the site. *Id.* at 479, 106 S.Ct. at 757. The Supreme Court was especially concerned because upon abandonment, the debtor "aggravated already existing dangers by halting security measures that prevented public entry, vandalism, and fire." *Id.* at 499 n. 3, 106 S.Ct. at 758 n. 3. In light of these facts, the Court prohibited abandonment without the "formulation of conditions that [would] adequately protect the public's health and safety." *Id.* at 506–7, 106 S.Ct. at 762. The Supreme Court cautioned, however, that this was a narrow exception to the trustee's ability to abandon burdensome estate property. *Id.* at 507 n. 9, 106 S.Ct. at 762 n. 9. The state law in issue must be one that protects "public health or safety from imminent and identifiable harm." *Id.* at 507 n. 9, 106 S.Ct. at 762 n. 9.

Where there has been a violation of state environmental laws but there is not any imminent harm or danger to the public, abandonment has been permitted. *Smith–Douglass*, 856 F.2d at 16. The *Smith–Douglass* court noted that the *Midlantic* exception to the trustee's abandonment power was formulated narrowly to protect public safety, not broadly to "shield the state treasury." *Id.* at 16.

Further, even if there is a risk of imminent harm, *Midlantic* does not dictate that a trustee must assume all responsibility for the clean-up of the property. Rather, the Supreme Court suggested that if the debtor were to comply with conditions formulated by the court that "adequately" protected the public health or safety, the property could be abandoned.

Courts following *Midlantic* accord administrative priority to post-petition clean-up costs based on pre-petition environmental damage if the damage constitutes an "imminent and identifiable" harm to the public health or safety. *See, Stevens*, 68 B.R. at 783 (claim for post-petition clean-up costs based on pre-petition environmental damage from storage of waste that constitutes an "immediate and identifiable danger" is entitled to administrative priority); *see also, National Gypsum*, 139 B.R. at 413.

Courts must look to the "design of the state law or regulation" in issue to see if its violation poses an imminent risk of harm. *Smith–Douglass*, 856 F.2d at 16.

■ Pegasus is relying on ECRA. This statute requires that upon the closing or transfer or sale of operations at an industrial site, the owner or operator is responsible for either certifying that there has been no discharge of hazardous substances at the site or, if there has been, having a clean-up plan prepared. N.J.Stat.Ann. § 13:1K–9.

The clean-up plan may be implemented by either the owner or operator. In addition, any other party to the transfer may assume the clean-up responsibility. N.J.Stat.Ann. § 13:1K–9(c). ECRA further provides that if there is a transfer of ownership, and if the site is to be "subject to substantially the same use by the ... transferee," the imple-

mentation of a clean-up plan may be deferred. N.J.Stat.Ann. § 13:1K–11(b)(2).

If any required clean-up could be deferred, this is hardly the type of "imminent" harm to public health or safety that was envisioned by the Supreme Court when it restricted the trustee's power to abandon burdensome estate property.

Thus, ECRA itself recognizes that the harm it addresses may not be imminent. While the parties failed to procure the requisite state agency's approval of any clean-up plan or deferral, the facts of this case indicate that the harm threatened by any release was not imminent. The major portion of the clean-up was not implemented until approximately one year after McCrory rejected the lease. In addition, at some point after McCrory left the site, Pegasus leased the site to another tenant who conducted substantially the same operations at the truck terminal. Inspections of the site, while under the control of the new tenant-operator, showed that the new tenant was discharging hazardous substances at the site. While a state health agency threatened to issue a notice of violation if the situation did not improve, there is no indication that any state agency threatened to close operations or required immediate clean-up of any damage caused by releases of hazardous substances.

The length of time between the transfer of the Property from McCrory to Pegasus and the clean-up, the subsequent use of the truck terminal by the new tenant for substantially the same purpose with new releases of hazardous substances, and the fact that the state agency never attempted to expedite the clean-up, all indicate that this was not the type of "imminent" harm to public health or safety that would preclude the trustee from abandoning the Property. As stated by the Fourth Circuit, the exception to the trustee's abandonment power applies if there is a serious health risk, not where the hazard "may await appropriate action." *Smith–Douglass*, 856 F.2d at 16.

As previously noted, the *Torwico* court appears to have indirectly applied the *Midlantic* abandonment analysis to find that the debtor could not avoid its responsibility to address the contaminated property. Because the *Torwico* court did not rely on *Midlantic* directly, it did not specifically address the issue of abandonment or its relation to the statue involved and the imminence of the harm threatened. While the *Torwico* court found that the debtor had an ongoing responsibility for the waste it generated under New Jersey environmental law, the court was faced with a situation distinguishable from the case before us. There, the property was found to have extensive groundwater contamination that was migrating off the property. Further, a state agency had taken enforcement action and issued an administrative order under the Solid Waste Management Act, N.J.Stat.Ann. § 13:1E–1 to –207 (West 1991), to compel compliance with the statute. In the court proceeding, the state agency also alleged violations of ECRA; the Spill Compensation and Control Act, N.J.Stat.Ann. § 58:10–23.11 to 23.24 (West 1992); and the Water Pollution Control Act, N.J.Stat.Ann. § 58:10A–1 to –60 (West 1992).

In the case at bar, while the consulting firm monitored the Property for groundwater contamination, there is no evidence that any resulted. In addition, the relevant state agency did not pursue any enforcement action with respect to McCrory's releases of hazardous substances. *See, Smith–Douglass*, 856 F.2d at 16. (Noting that if state agency takes no enforcement action, this is indicative of absence of threat to public health or safety.) Further, the new tenant conducted similar activity at the Property with no state enforcement action concerning that tenant's prior releases and only a warning concerning future releases. Finally, the clean-up proceeded at a leisurely pace.

In view of the state statute's option allowing deferral of any required clean-up if the approval of the Department of Environmental Protection and Energy were obtained, and in light of the facts of this case that show no reason why the state agency's approval would have been denied, this court concludes that there was no imminent harm posed to the public health or safety. Thus, applying the *Midlantic* rationale, McCrory would not be precluded from abandoning the lease. Based on this, together with the fact that McCrory previously rejected the lease, ren-

dering the lease no longer property of the estate, this Court concludes that the post-petition clean-up costs did not benefit or preserve the estate.

### CONCLUSION

Inasmuch as the lease is not currently property of the estate and because we find that the *Midlantic* analysis would not have precluded debtor from abandoning the Property or implicated any obligation compelling McCrory to maintain or preserve the Property in compliance with environmental laws, we hold that the environmental clean-up costs under ECRA stemming from McCrory's pre-petition actions are not entitled to an administrative expense priority.

A trial is necessary to determine the extent of costs attributable to hazardous discharges occurring during the term of McCrory's lease. To the extent those discharges were pre-petition, the costs associated with them are general unsecured claims.

Debtor's counsel is to settle an order consistent with this decision on five (5) days notice.