**In re ST. LAWRENCE CORPORATION,**
**Debtor.**

**State of New Jersey Department of**
**Environmental Protection,**
**Appellant,**

v.

**Bruce Atkinson, Esq., et al., Appellees.**

**Bankruptcy No. 98–50249 SAS.**
**CIV.A. No. 99–5707 MLC.**

United States District Court,
D. New Jersey.

May 23, 2000.

Rachel Jeanne Lehr, Office of the Attorney General of New Jersey, Trenton, NJ, for Appellant State of New Jersey, Department of Environmental Protection.

Sam Della Fera, Jr., Gibbons, Del Deo, Dolan Griffinger & Vecchione A Professional Corporation, One Riverfront Plaza, Newark, NJ, for Appellee.

Bruce D. Atkinson, Chapter 7 Trustee.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on an appeal by the State of New Jersey Department of Environmental Protection (the "DEP") from an Order (the "Order") of the bankruptcy court dated October 27, 1999, which incorporated a Memorandum Opinion [1] (the "Opinion") dated October 7, 1999, granting the motion of Bruce Atkinson, Esq., Chapter 7 Trustee (the "Trustee"), to abandon real property of the bankruptcy estate. The DEP seeks reversal of the Order claiming that the bankruptcy court erred by allowing the Trustee to

abandon real property without first complying with state environmental laws and abused its discretion by placing the burden of proof for opposing the Trustee's motion upon the DEP. For the reasons expressed in this Memorandum and Order, the decision of the bankruptcy court is affirmed.

## BACKGROUND

On November 13, 1995, St. Lawrence Corp., the debtor, filed a voluntary petition for relief under chapter 11 of title 11, United States Code (hereinafter the "Bankruptcy Code" or "Code").[2] *In re St. Lawrence Corp.*, 239 B.R. 720, 722 (Bankr. D.N.J.1999). The debtor's primary asset is real property (hereinafter "the property") consisting of two commercial buildings and adjacent land. *Id.* Prior to bankruptcy, the debtor operated its business of managing the property, which was leased to one residential and six commercial tenants, and continued to do so as debtor in possession until a trustee was appointed. *Id.*

The bankruptcy court directed the appointment of a chapter 11 trustee in January 1996 and Stephen Tsai was appointed. *Id.* His appointment was terminated in June 1997 and Ellen B. Kulka was appointed as substitute trustee. *Id.* Mr. Tsai and Ms. Kulka shall be referred to henceforth as "the chapter 11 trustee." *Id.* Starbare III Partners, L.P. ("Starbare") holds liens on the real property, rent and fire insurance proceeds, securing a claim of approximately $1.2 million. *Id.* There is no equity in the assets subject to Starbare's lien. *Id.* The chapter 11 trustee administered the property and attempted to sell it. *Id.* In April 1998, a fire damaged the main building on the property, displacing three tenants and causing the loss of the rent from their leases. *Id.* While partial insurance payments have

---

1. The Opinion is reported as *In re St. Lawrence Corp.*, 239 B.R. 720 (Bankr.D.N.J.1999).

2. The DEP is not challenging the bankruptcy court's findings of fact on appeal. Therefore, the Court will review the bankruptcy court's legal conclusions in light of the bankruptcy court's factual findings, which will not be disturbed and are incorporated below.

been made, only minimal repairs have been done. *Id.* Notwithstanding the fire damage, competing offers were made by William M. Richardson and Harry A. Richardson, principals of the debtor, to purchase the property for amounts less than the amount due to Starbare. *Id.* Both offers were, however, eventually withdrawn. *Id.*

Having determined that sale of the property was not possible and that the property had no other value to the estate, the chapter 11 trustee filed a motion on November 25, 1998 to abandon the property, or in the alternative to convert the case to chapter 7. *Id.* The DEP opposed abandonment, arguing that the trustee is required to comply with state environmental law before abandoning the property. *Id.* At a hearing on December 17, 1998, the bankruptcy court converted the case to chapter 7 and adjourned the motion as to abandonment. *Id.* The Trustee was appointed chapter 7 trustee. *Id.* On May 17, 1999, the court heard oral argument on the motion for abandonment and reserved decision. *Id.*

Meanwhile, on March 19, 1999, Starbare moved for relief from the automatic stay as to the property and for turnover of all cash of the estate as its cash collateral. *Id.* The Trustee did not oppose the motion as to the property, but opposed it as to the cash collateral. *Id.* However, on June 17, 1999, an agreed order was entered granting Starbare relief from the automatic stay as to the real property, fire insurance proceeds and rents, net of specified compensation amounts to the Trustee and the chapter 11 trustee and their professionals for administering the property. *Id.* It appears from the certification of the Trustee filed on March 30, 1999 in opposition to Starbare's motion that he did administer the property to the extent possible in view of the limitations imposed by Starbare on the expenditure of its cash collateral, while

determining if sale was possible, and he continued to employ a property manager who had been employed by the chapter 11 trustee. *Id.* The Trustee did not, however, obtain authorization from the bankruptcy court under Code section 721 to operate the debtor's business. *Id.*

The chapter 11 trustee and the Richardsons assumed during the negotiations for the sale of the property that the provisions of the New Jersey Industrial Site Recovery Act ("ISRA"), N.J. Stat. Ann. ("N.J.S.A.") 13:1K–6 to –14 (West 1991 & Supp.1999) would have to be complied with in connection with a sale.[3] *Id.* at 722–23. Harry Richardson therefore obtained a Phase I Environmental Site Assessment, which, according to the verified motion for abandonment, "disclosed no serious or material environmental remediation issues and certainly no imminent or other danger to public health or safety." *Id.* at 723 (citing Trustee's Verified Motion filed 11–25–98 ¶ 22). William Richardson never provided a site assessment, but his counsel alleged in a letter dated November 20, 1998 that his environmental consultant said there was possible contamination and used that as a justification for modifying his purchase offer. *Id.* (citing Trustee's Verified Motion Ex. A). The DEP's objection to the abandonment motion states that an unidentified tenant has submitted a preliminary site assessment and obtained a "no further action" letter, but the DEP knows nothing about the rest of the property. *Id.* The DEP states further that a Phase I Environmental Audit (presumably, Harry Richardson's audit) is not acceptable. *Id.* (citing DEP Objection filed 12–10–98 at 2).

On October 7, 1999, the bankruptcy court granted the Trustee's motion to abandon the property over the DEP's objection, finding:

The record on the motion contains no other evidence as to whether there is

---

**3.** There is no evidence in the record that the property is subject to ISRA. The parties appear to assume that the property is subject to

ISRA. Thus, as did the bankruptcy court, so shall we.

any environmental contamination of the property. The hearsay in the November 20, 1998 letter from William Richardson's counsel does not rise to the level of proof of contamination. It follows that there is also no proof that any contamination constitutes an imminent and identifiable harm to the public, or that abandonment will aggravate any threat of such harm.

*Id.* The bankruptcy court's findings of fact and conclusions of law were memorialized in the Opinion and incorporated by reference into the Order.

The DEP appeals the Order, arguing: (1) the bankruptcy court erred by allowing the Trustee to abandon the property without first complying with ISRA, N.J.S.A. 13:1K–6 et seq., and (2) the bankruptcy court abused its discretion by placing the burden of proving that contamination was present at the property upon the DEP rather than upon the Trustee. (Appellant's Br. at 5.)

### STANDARD OF REVIEW

This Court must accept the bankruptcy court's findings of fact unless those findings are clearly erroneous. Fed. R. Bankr.P. 8013; *In re Reid,* 757 F.2d 230, 233 (10th Cir.1985). To the extent that a question presented is one of law, we must exercise plenary review. *See In re Sharon Steel Corp.,* 871 F.2d 1217, 1222–23 (3d Cir.1989). Where there are mixed questions of law and fact, this Court must break down these questions and apply the appropriate standard to each component. *Id.*

### DISCUSSION

Bankruptcy Code section 554(a) provides, "After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a).

The Supreme Court in *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), in a 5 to 4 decision, found a "narrow" exception to this abandonment power, holding:

> ... Congress did not intend for § 554(a) to preempt all state and local laws. The Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety. Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.

*Id.* at 507, 106 S.Ct. 755. The Court also stated in a footnote that:

> This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.

*Id.* at 507 n. 9, 106 S.Ct. 755.

The majority in *Midlantic* found that when Congress enacted § 554, there were "well-recognized restrictions on a trustee's abandonment power." *Id.* at 501, 106 S.Ct. 755. The Court discussed three cases in reaching this conclusion: *Ottenheimer v. Whitaker,* 198 F.2d 289 (4th Cir.1952) (holding that trustee could not abandon several barges when abandonment would have obstructed a navigable passage in violation of federal law), *In re Chicago Rapid Transit Co.,* 129 F.2d 1 (7th Cir.1942) (holding that trustee's rejection of railway line lease was properly conditioned upon temporary compliance with state law requiring continued operation of line pending takeover of line by

lessor), and *In re Lewis Jones, Inc.*, 1 B.C.D. 277 (Bankr.E.D.Pa.1974) (holding that even absent violation of state or federal law, equitable considerations required trustee to safeguard the public interest by sealing underground steam lines before abandoning them). *Id.* at 500, 106 S.Ct. 755. The Court found that although these cases do not define the "exact contours" of the trustee's abandonment power, they do make clear that this power was subject to certain restrictions when Congress enacted § 554(a). *Id.* at 501. The Court then stated, "One cannot assume that [in enacting § 554(a)] Congress ... intended to discard a well-established judicial restriction on the abandonment power." *Id.* at 502, 106 S.Ct. 755. "Congress also presumably included the established corollary that a trustee could not exercise his abandonment power in violation of certain state and federal laws." *Id.* at 501, 106 S.Ct. 755.

 Cases attempting to define the restrictions on a trustee's abandonment power since the *Midlantic* decision have not been entirely consistent because *Midlantic* failed to provide clear guidance regarding the exact contours of the "well-established judicial restriction" it identified. The limitations of the Court's holding in *Midlantic* were recognized by then-Justice Rehnquist in his dissent. *Id.* at 516, 106 S.Ct. 755 (J. Rehnquist, dissenting) (commenting that "the Court declines to identify those laws it deems [to be] 'reasonably calculated' "). Notwithstanding these limitations, the Court is satisfied that the restrictions on abandonment identified in *Midlantic* do not apply unless each of the following conditions have been demonstrated:

(1) an identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety;

(2) abandonment of the property will violate a state statute or regulation;[4]

(3) the statute or regulation being violated is reasonably designed to protect the public health and safety from imminent and identifiable harm caused by identified hazards;[5] and

(4) compliance with the statute or regulation would not be so onerous as to interfere with the bankruptcy administration itself.[6]

---

4. The violation stemming from abandonment must not be a speculative or indeterminate future violation. *Midlantic*, 474 U.S. at 507 n. 9, 106 S.Ct. 755. In addition, there is no reason why the rule announced in *Midlantic* would not apply if a federal, rather than a state statute or regulation, were implicated. *Midlantic*, 474 U.S. at 501, 106 S.Ct. 755 (stating that "Congress also presumably included the established corollary that a trustee could not exercise his abandonment power in violation of certain state and *federal* laws") (emphasis added).

5. Even if abandonment would not violate a state statute or law, abandonment will not be allowed unless the bankruptcy court formulates conditions that will adequately protect the public's health and safety from the identified hazard. *Midlantic*, 474 U.S. at 501, 506–07, 106 S.Ct. 755; *see also Lewis Jones*, 1 B.R.D. at 280 (cited with approval in *Midlantic*) (citing *Securities & Exch. Comm'n v. United States Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940)); *City of New York v. Quanta Resources Corp.*, 739 F.2d 912, 920 (3d Cir.1984), *aff'd sub nom. Midlantic Nat'l Bank v. New Jersey*

*Dep't of Envtl. Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (citing *United States Realty, supra*, and Fed. R. Bankr.P. 105(a)). Such a restriction on the trustee's abandonment power is not an issue of preemption but rather part of the contours of the abandonment power codified by Congress when it enacted § 554 of the Bankruptcy Code. *Cf. Midlantic*, 474 U.S. at 501, 106 S.Ct. 755.

6. Although the Supreme Court did not reach this question, it implied that some state laws may impose conditions too onerous on the bankruptcy proceeding to be enforced. Examples might include the following: (1) when the estate lacks unencumbered assets with which to comply with state law, (2) when compliance would take too long for the proceeding to be expeditious, or (3) when compliance would allow environmental authorities to completely usurp administration of the case. *See, e.g., In re Peerless Plating Co.*, 70 B.R. 943, 947 n. 3 (Bankr.W.D.Mich.1987). In such cases, the bankruptcy court is free to formulate conditions short of full compliance with state law that will adequately protect the public's health and safety. *See* note 5, *supra*.

*Midlantic*, 474 U.S. at 506–07, 106 S.Ct. 755.

If these conditions are met, the state law or regulation is not preempted by § 554 of the Bankruptcy Code. *Id.* Before applying the facts of this case to each of these elements, however, we must first determine who bears the burden of proving whether or not the *Midlantic* exception to the trustee's abandonment power applies.

## I. Whether the Bankruptcy Court Erred by Misallocating the Burden of Proof

█ The bankruptcy court held that the Trustee has the burden, under section 554(a) of the Bankruptcy Code, of proving that property to be abandoned is either burdensome to the estate or is of inconsequential value and benefit to the estate. *St. Lawrence*, 239 B.R. at 726–27. The bankruptcy court also held that if the Trustee meets that burden, the burden then shifts to the party opposing abandonment under the *Midlantic* exception, in this case the DEP, to prove facts that would support application of the *Midlantic* exception. *Id.*

The DEP has appealed the bankruptcy court's placement upon the DEP of the burden of proving the factual elements of the *Midlantic* exception. Under ISRA, the owner or operator of an industrial establishment has the burden of proving to the DEP that the property is not contaminated, or that any contamination has been or will be remediated, as a precondition to the closure, sale, or transfer of certain industrial properties. N.J.S.A. § 13:1K–6 *et seq.* The DEP argues that the bank-

ruptcy court should have applied this burden of proof, thereby requiring the Trustee to disprove the first element of the *Midlantic* exception, i.e., the nonexistence of environmental contamination to be remediated, before allowing the Trustee to abandon the property.[7] (*See, e.g.,* Pl.'s Reply Br. at 9.)

█ Which party has the burden of proof is an issue of law. Therefore, the Court will exercise plenary review over the bankruptcy court's assessment of the burden of proof. *See In re Sharon Steel Corp.*, 871 F.2d at 1222–23.

█ The bankruptcy court correctly noted that the general rule is that the burden of proof rests on the party who has the affirmative of an issue. *See* 31A C.J.S. Evidence § 121 at 254–55 (1996); 29 Am. Jur.2d Evidence § 158 at 184 (1994). The test for determining which party has the affirmative, and therefore the burden of establishing an issue, is which party would be unsuccessful if no evidence is provided. *See* 31A C.J.S. Evidence § 121 at 255; 29 Am.Jur.2d Evidence § 158 at 185.

█ Another general rule is that one who relies on an exception to a general rule or statute has the burden of proving that the case falls within the exception, unless the nonexistence of the exception is made a condition of the application of the rule. *See* 31A C.J.S. Evidence § 121 at 256; 29 Am.Jur.2d Evidence § 159 at 186; *see also Schlemmer v. Buffalo, Rochester & Pittsburg Ry. Co.*, 205 U.S. 1, 10, 27 S.Ct. 407, 51 L.Ed. 681 (1907); *Fennell v.*

---

7. Although not an issue on appeal, the DEP also argues that the Trustee is required to comply with ISRA pursuant to 28 U.S.C. § 959(b). (Appellant's Br. at 3–4.) Section 959(b) states that "... a trustee ... shall manage and operate the property in his possession ... according to the requirements of the valid laws of the State in which such property is situated in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." Section 959(b) does not generally apply to abandonment under § 554(a). *See Midlantic*, 474

U.S. at 505, 106 S.Ct. 755; *see also id.* at 514, 106 S.Ct. 755 (J. Rehnquist, dissenting) ("Assuming that temporary management or operation of a facility during liquidation is governed by § 959(b), I believe that a trustee's filing of a petition to abandon, as opposed to continued operation of a site pending a decision to abandon, does not constitute 'manage[ment]' or 'opera[tion]' under that provision."). If the Trustee were subject to § 959(b), the Trustee would be required to comply with ISRA as well as any burden of proof provisions contained therein.

*Ferreira,* 133 N.J.Super. 63, 67–68, 335 A.2d 84 (Law Div.1975).

Applying these rules to this case, it is clear that the bankruptcy court correctly determined that the DEP had the burden of proving facts necessary to show that the *Midlantic* exception to the Trustee's abandonment power applied.[8] The DEP has the affirmative with respect to the first three elements because it would be unsuccessful if no evidence on the issue were submitted. As made clear in *Midlantic,* the fourth element is really an exception to the exception. If no evidence as to the fourth element were submitted, the Trustee would be unsuccessful on the abandonment motion if the first three elements of *Midlantic* had otherwise been shown. Therefore, as to the fourth element, the burden of proof should be placed upon the Trustee if the DEP had met its burden on the first three elements.

Further application of these general rules reveals that the nonexistence of the *Midlantic* exception is not a precondition to application of § 554(a). Section 554(a) makes no mention of any exceptions and the bankruptcy courts have not required trustees to prove the nonexistence of the *Midlantic* exception as a precondition to abandonment. Moreover, the courts that have considered whether the *Midlantic* exception has applied appear to have placed the burden on the party seeking to prove the exception. *See In re Smith–Douglass, Inc.,* 856 F.2d 12, 16 (4th Cir.1988) (holding that absence of any enforcement action by the state environmental protection agency indicates no threat of environmental harm); *In re L.F. Jennings Oil Co.,* 4 F.3d 887, 890–91 (10th Cir.1993) (finding absence of property from state's list of contaminated sites and insufficient data by state's expert that there was a present threat led to conclusion that property did not pose an immediate threat to public health or safety); *In re Anthony Ferrante & Sons, Inc.,* 119 B.R. 45, 50 (D.N.J.1990) (finding absence of DEP enforcement action after DEP knew of environmental contamination for eight years indicated no immediate threat to public health or safety). Accordingly, the bankruptcy court properly placed the burden of proving the applicability of the *Midlantic* exception upon the DEP.[9]

## II. Whether the Bankruptcy Court Erred in Permitting Abandonment

▮ The bankruptcy court found, and the DEP does not contest, that the property is burdensome and valueless to the estate. (*See* Pl.'s Reply Br. at 1.) The DEP only challenges the bankruptcy court's de-

---

8. Of course the burden of proof exists only in connection with an issue of fact and not with interpretation of any law. *See* 31A C.J.S. Evidence § 121 at 255; *Walling v. California Conserving Co.,* 74 F.Supp. 182 (N.D.Cal. 1945), *aff'd sub nom. McComb v. Hunt Foods,* 167 F.2d 905 (9th Cir.1948).

9. It is important to note that the bankruptcy court did not determine whether ISRA was violated; instead, the court determined that a proper showing for abandonment had been made and that the *Midlantic* exception to abandonment did not apply because the DEP had failed to prove the existence of an identified hazard or that abandonment would aggravate a risk of imminent and identifiable harm to the public health and safety posed by that hazard. *St. Lawrence,* 239 B.R. at 727. To the extent a bankruptcy court would be required to determine whether ISRA was violated, such a determination is only relevant to

the second element of the *Midlantic* exception, i.e. whether abandonment would violate state law. The bankruptcy court did not reach this element because the DEP failed to prove the existence of an identified hazard. We do not now, nor do we need to, reach the question whether a bankruptcy court would ever be required to apply the burden of proof set forth under state law in applying *Midlantic,* e.g., in determining whether the state law was violated. It is clear, however, that if a trustee did bear such a burden, he would bear it only for those facts not essential to the first three elements of the *Midlantic* exception and only to the extent the party opposing abandonment had met its burden with respect to those elements. Therefore, a state statute should not be used to impose upon a trustee the burden of proving the nonexistence of a health or safety hazard on property before seeking to abandon it.

termination that *Midlantic* does not bar abandonment of the property.

■ As set forth above, a party opposing abandonment based upon *Midlantic* must address four elements. The bankruptcy court held that the DEP failed to carry its burden with respect to the first element because it produced no evidence that an identified hazard exists on the property. *St. Lawrence*, 239 B.R. at 727. Because the DEP does not challenge the bankruptcy court's factual findings, the Court needs only to apply the facts as found by the bankruptcy court to the law. Thus, the Court's analysis is solely one of law and the Court will exercise plenary review. *See In re Sharon Steel Corp.*, 871 F.2d at 1222–23. For the reasons set forth below, the DEP has failed to prove that application of the *Midlantic* exception bars the Trustee's abandonment of the property. The Court will first address the first element of the *Midlantic* exception to abandonment.

A. *Whether an Identified Hazard Exists that Poses a Risk of Imminent and Identifiable Harm to the Public Health and Safety*

In order to prove that application of the *Midlantic* exception bars abandonment of property, a party must show that an identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety. In *Midlantic*, the existence of an identified hazard was not in dispute. There were "470,000 gallons of highly toxic and carcinogenic waste oil in unguarded, deteriorating containers 'present[ing] risks of explosion, fire, contamination of water supplies, destruction of natural resources, and injury, genetic damage, or death through personal contact.'" *Midlantic*, 474 U.S. at 499 n. 3, 106 S.Ct. 755. The only evidence offered below as to the existence of a hazard on the property was a letter dated November 20, 1998 from William Richardson's counsel alleging that his environmental consultant said there was possible contamination. *St. Lawrence*, 239 B.R. at 723 (citing Trustee's Verified Motion Ex. A). The bankruptcy court correctly concluded that the hearsay in the November 20, 1998 letter does not rise to the level of contamination. *Id.*

■ In addition, all the admissible evidence offered below demonstrates that the property does not constitute a hazard that poses a risk of imminent and identifiable harm to the public health and safety. Harry Richardson's Phase I Environmental Site Assessment "disclosed no serious or material environmental remediation issues and certainly no imminent or other danger to public health or safety." *Id.* (citing Trustee's Verified Motion ¶ 22). The DEP stated in its objection to the motion that a Phase I Environmental Audit (presumably, Harry Richardson's audit) is not acceptable. *Id.* (citing DEP Objection at 2). There is no indication in the record why the DEP did not find this report acceptable. The DEP's objection to the abandonment motion also stated that an unidentified tenant submitted a preliminary site assessment and obtained a "no further action" letter, but the DEP knows nothing about the rest of the property. *Id.* The issuance of a "no further action" letter by the DEP indicates that at least part of the property contains no environmental hazards that pose a risk of harm to the public health or safety. If part of the property poses no hazard, without anything more, it can be inferred that the remainder of the property also poses no hazard. Finally, there is no evidence that the DEP has taken any steps to address any identified hazard. Inaction or delay by the DEP to act provides support for the conclusion that no imminent threat of harm to the public existed. *Ferrante*, 119 B.R. at 50. Accordingly, the DEP has failed to prove that an identified hazard exists on the property that poses a risk of imminent and identifiable harm to the public health and safety. Although we could end our analysis here, we will also address the second and third elements.

*B. Whether ISRA is Reasonably designed to Protect the Public Health and Safety from Imminent and Identifiable Harm Caused by Identified Hazards*

The DEP is relying on the Trustee's alleged violation of ISRA as a basis to prevent the Trustee from abandoning the property. Assuming *arguendo* that the second element (violation of ISRA) is met, the third element inquires whether the statute or regulation allegedly being violated is reasonably designed to protect the public health and safety from imminent and identifiable harm caused by identified hazards.

ISRA requires that upon the closing, sale, or transfer of ownership or operation of an industrial establishment, the owner or operator of the industrial establishment shall certify that there has been no discharge of hazardous substances at the site or, if there has been, that the site has been remediated, or a remedial action workplan has been approved. *See* N.J.S.A. § 13:1K–9.

The obligations ISRA imposes upon owners or operators of industrial establishments to perform assessments, investigations, and remedial action may be assumed by any other party. *See* N.J.S.A. § 13:1K–9(b)(3). In addition, if there is a transfer of ownership or operations, and the site is to be "subject to substantially the same use by the ... transferee," the preparation, approval, and implementation of a remedial action workplan may, under certain circumstances, be deferred until the use changes or until the transferee closes operations. *See* N.J.S.A. § 13:1K–11(a).

ISRA contains the following legislative findings and declarations:

The Legislature finds that discharges of toxic chemicals dating back to early industrialization have left a legacy of contaminated industrial property in this State; that in 1983, due to the growing public awareness and concerns of the risks to the public health and the environment and the potential costs to the State to clean up abandoned contaminated sites, the "Environmental Cleanup and Responsibility Act" was enacted. The Legislature also finds that the act's imposition of a cleanup plan approval before the transfer or upon the closing of an industrial establishment and the requirement to establish a funding source for the cleanup are in the general public interest by ensuring the discovery of contamination, by assuring that funding for cleanup is set aside at the time it is available from a transfer or closing, and by assuring that contaminated property is not abandoned to the State for cleanup. The Legislature further finds that at the time of the act's passage, the extent of the State's industrial contamination and the cost and complexity of remediation were not well understood; that in the intervening years, there has been a significant advance in the body of knowledge concerning how to remediate contaminated sites effectively and how to manage the remediation efficiently; that the regulated and financial communities are now more familiar with the liabilities involving contaminated property and with the necessity to discover and remediate that contamination; and that it is in the interest of the environment and the State's economic health to promote certainty in the regulatory structure and to allow greater privatization of that process where it is possible to do so without incurring unnecessary risk to the public health or the environment.

The Legislature therefore declares that it is the policy of this State to protect the public health, safety, and the environment, to promote efficient and timely cleanups, and to eliminate any unnecessary financial burden of remediating contaminated sites; that these policies can be achieved by streamlining the regulatory process, by establishing summary administrative procedures for industrial establishments that have previously undergone an environmental re-

view, and by reducing oversight of those industrial establishments where less extensive regulatory review will ensure the same degree of protection to public health, safety, and the environment; and that the new procedures established pursuant to this act shall be designed to guard against the redundancy from the regulatory process and to minimize governmental involvement in certain business transactions.

N.J.S.A. § 13:1K–7. It is clear from reading these findings and declarations that the purpose of ISRA is quite broad. The design of the statute certainly encompasses more than protecting the public health and safety from imminent and identifiable harm caused by identified hazards. For example, some of the primary aims are "ensuring the discovery of contamination," "assuring that funding for cleanup is set aside at the time it is available from a transfer or closing," "assuring that contaminated property is not abandoned to the State for cleanup," "protect[ing] the public health, safety, and the environment" in general,[10] "promot[ing] efficient and timely cleanups," and "eliminat[ing] any unnecessary financial burden of remediating contaminated sites." *Id.* Thus, ISRA is preempted by the abandonment statute

except to the extent that any of its provisions are reasonably calculated to protect the public health and safety from imminent and identifiable harm caused by identified hazards. *Midlantic*, 474 U.S. at 506–07, 106 S.Ct. 755. The DEP has failed to allege which of ISRA's provisions are so calculated.[11] For these reasons, the DEP has failed to sustain its burden of proving application under *Midlantic* of an exception to the Trustee's power to abandon the property.[12] Accordingly, we do not reach the fourth element, whether compliance with the statute or regulation would be so onerous as to interfere with the bankruptcy administration itself.

For the foregoing reasons, the Court holds that the bankruptcy court correctly determined that the DEP failed to set forth facts necessary to support its objection to the Trustee's abandonment of the property.

### CONCLUSION

For the reasons expressed above, the Court holds that the bankruptcy court properly placed upon the DEP the burden of proving facts necessary to support an objection to the Trustee's abandonment power based upon *Midlantic*. The Court

10. Protecting the public health and safety from imminent and identifiable harm caused by identified hazards appears to be a subset of this purpose.

11. By permitting remediation to be deferred under certain circumstances, ISRA itself recognizes that the harm it addresses may not be imminent. *See McCrory Corp.*, 188 B.R. 763, 769 (Bankr.S.D.N.Y.1995) (discussing *Midlantic* exception as it applied to the New Jersey Environmental Cleanup and Responsibility Act, ISRA's predecessor). Following abandonment, control of the property will be returned to the party in possession of the property, most likely the debtor, the receiver, or the tenant. *See, e.g., In re Dewsnup*, 908 F.2d 588, 590 (10th Cir.1990), *aff'd sub nom. Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). There is no indication in the record that the use of the property will change following abandonment or that the DEP would not allow any remediation obligations to be deferred. The excep-

tion to a trustee's abandonment power applies only when there is a serious and imminent health risk, not where the hazard may await appropriate action. *See Smith–Douglass*, 856 F.2d at 16; *McCrory*, 188 B.R. at 769. The DEP has failed to identify any health risk, much less a serious and imminent one.

12. The DEP does not allege that the bankruptcy court should have invoked its equitable power, as recognized in *Midlantic*, see n. 5, *supra*, to formulate conditions to abandonment necessary to adequately protect the public's health and safety, even if no state statute were violated. Even if the DEP had made such an argument, such argument would have failed because the DEP failed to allege the existence of an identified hazard on the property that poses a risk of imminent and identifiable harm to the public health and safety. A bankruptcy court should not place any such conditions on abandonment without first finding that such a hazard exists.

also holds that the bankruptcy court correctly concluded that the DEP has failed to meet that burden.